[No. E012018. Fourth Dist., Div. Two. Dec. 15, 1994.]

DEBORAH FREEMAN et al., Plaintiffs and Appellants, v.
CURTIS HALE, Defendant and Respondent.

## COUNSEL

Howarth & Smith, Don Howarth, Marcus J. Berger and Kenneth S. Tune for Plaintiffs and Appellants.

Cassidy, Warner, Brown, Combs & Thurber, B. Kent Warner and Glen A. Stebens for Defendant and Respondent.

## OPINION

**McKINSTER, J.**—Plaintiffs appeal from a summary judgment entered against them in their action for damages for personal injuries and loss of consortium. We reverse. In doing so, we hold that (1) the consumption of alcoholic beverages is not an activity which is within the range of activities involved in the sport of downhill snow skiing; (2) to the extent the consumption of alcohol increases the risk of collision between the drinking skier and other skiers, that increased risk is not one which is inherent in the sport; and (3) therefore the other skiers have not assumed that increased risk merely by participating in the sport.

### FACTUAL BACKGROUND

At 3 p.m. on November 26, 1986, Deborah Freeman (Freeman), a 21-year-old, experienced skier, boarded a chartered bus in Riverside for a 5-day ski trip sponsored by the Ski Club of Riverside Community College. Defendant Curtis Hale was also on the bus. They arrived at a hotel in Utah at 7 a.m. the

next morning, checked in, changed clothes, and reboarded the bus for Snowbird Mountain.

They began skiing at approximately 9 a.m. Freeman and Hale skied with a group of two or three other people throughout the day. While the parties disagree as to how the collision occurred, it is undisputed that at approximately 4 p.m., while skiing together, Hale fell on top of Freeman. Freeman's neck was broken, resulting in quadriplegia.

On the overnight trip to Utah, Hale consumed alcoholic beverages and slept for only two to three hours. Before leaving the hotel for the ski slopes, he filled a bota bag with a mixture of bourbon and Coca-Cola. Hale drank from that bag on a number of occasions after lunch. At times, Hale was loud and boisterous, apparently manifesting some of the symptoms normally associated with drinking alcohol.

## PROCEDURAL BACKGROUND

Freeman and her husband filed a timely action against Hale, seeking to recover damages for the personal injuries suffered by Freeman and for the loss of consortium suffered by her husband. It alleges in part that those injuries and that loss were proximately caused by Hale by skiing so "negligently, recklessly and carelessly" that he collided with Freeman.

Trial was set for September 14, 1992. The Supreme Court's long-awaited opinions in *Knight* v. *Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*) and *Ford* v. *Gouin* (1992) 3 Cal.4th 339 [11 Cal.Rptr.2d 30, 834 P.2d 724] had been issued less than a month earlier. The parties stipulated to waive the usual notice requirements to permit Hale to move for summary judgment based on the new decisional law. (Code Civ. Proc., § 437c.) The motion was filed on September 16 and argued on September 18. The trial court granted the motion, and entered judgment in favor of Hale. Freeman and her husband appeal.

## DISCUSSION

In his answer to the complaint, Hale alleged that he had no liability because Freeman had assumed the risk of any harm. His motion for summary judgment was made and granted on the same ground. Accordingly, we first examine the current law governing that defense, and then apply that law to the facts established by Hale's motion for summary judgment.

A. *The Defense of Implied Assumption of the Risk After Knight v. Jewett*

In *Knight*, the Supreme Court set out to resolve "the question of the proper application of the 'assumption of risk' doctrine in light of [that] court's

adoption of comparative fault principles in *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 . . . ." (*Knight, supra*, 3 Cal.4th at pp. 299-300.[1]) Preliminarily, the court noted that the assumption of the risk doctrine has been confusingly applied to two different types of factual settings involving analytically distinct legal concepts. (*Id.* at p. 303.)

"In some settings—for example, most cases involving sports-related injuries—past assumption of risk decisions largely have been concerned with defining the contours of the legal duty that a given class of defendants—for example, owners of baseball stadiums or ice hockey rinks—owed to an injured plaintiff." (*Knight, supra*, 3 Cal.4th at pp. 303-304.) Those cases which conclude that there was no legal duty on the part of the defendant to protect the plaintiff from the particular risk of harm that caused the injury are examples of " 'primary assumption of risk.' " (*Id.* at pp. 308, 314-315.) In those cases, the plaintiff's recovery continues to be completely barred, despite the comparative fault doctrine. (*Ibid.*)

"In other settings, the assumption of risk terminology historically was applied to situations in which it was clear that the defendant had breached a legal duty of care to the plaintiff, and the inquiry focused on whether the plaintiff knowingly and voluntarily had chosen to encounter the specific risk of harm posed by the defendant's breach of duty." (*Knight, supra*, 3 Cal.4th at p. 304.) When the plaintiff has done so, his or her decision is an example of " 'secondary assumption of risk,' " which has now been "merged into the comprehensive comparative fault system adopted in *Li*." (*Id.* at p. 308, fn. omitted.) In those cases, the jury will compare the plaintiff's responsibility for his or her injuries to that of the defendant, so that the loss may be equitably apportioned between them. (*Id.* at pp. 314-315.)

■  Whether the defendant owed a legal duty to protect the plaintiff from a particular risk of harm depends on the nature of the activity or sport in which the defendant was engaged, and on the role or relationship of the defendant and the plaintiff to that activity or sport. (*Knight, supra*, 3 Cal.4th at pp. 309, 313, 317.) That question is one "to be decided by the court, rather than the jury." (*Id.* at p. 313.)

■  "As a general rule, persons have a duty to use due care to avoid injury to others, and may be held liable if their careless conduct injures

---

[1]The opinion to which we cite in *Knight* is a plurality opinion written by Justice George, in which two other justices joined. (3 Cal.4th at p. 321.) In a separate concurring and dissenting opinion, Justice Mosk concurred in the analysis of the plurality opinion which limited the liability of sports participants, differing only by urging that the doctrine of implied assumption of the risk should be eliminated altogether. (*Id.* at pp. 321-322 (conc. & dis. opn. of Mosk, J.).) Since Justice George's analysis garnered the support of a majority of the high court, ". . . we follow the lead opinion as though it were a majority opinion." (*Galardi* v. *Seahorse Riding Club* (1993) 16 Cal.App.4th 817, 821, fn. 1 [20 Cal.Rptr.2d 270].)

another person. . . . In the sports setting, however, conditions or conduct that otherwise might be viewed as dangerous often are an integral part of the sport itself." (*Knight, supra,* 3 Cal.4th at p. 315.) "Although defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport." (*Id.* at pp. 315-316.)

For example, "although moguls on a ski run pose a risk of harm to skiers that might not exist were these configurations removed, the challenge and risks posed by the moguls are part of the sport of skiing, and a ski resort has no duty to eliminate them." (*Knight, supra,* 3 Cal.4th at p. 315.) By contrast, the risk that the resort will fail to maintain a towrope is not one which is inherent in the sport, and thus the resort "does have a duty to use due care to maintain its towropes in a safe, working condition so as not to expose skiers to an increased risk of harm." (*Id.* at p. 316.)

Sometimes, however, the risk that other participants in the sport will engage in careless conduct is inherent in the sport. For instance, the chance that a baseball player will carelessly throw a ball, injuring another player, is inherent in baseball. One of the risks inherent in basketball is that one player will carelessly extend an elbow, injuring another player. The question is, how are courts "to determine when careless conduct of another [participant] properly should be considered an 'inherent risk' of the sport that (as a matter of law) is assumed by the injured participant?" (*Knight, supra,* 3 Cal.4th at p. 316.)

In answering this question, the Supreme Court first suggested that a risk is inherent if it cannot be eliminated "without altering the nature of the sport." (*Knight, supra,* 3 Cal.4th at p. 317.) It then settled upon the following distinction: "[I]t is improper to hold a sports participant liable to a coparticipant for ordinary careless conduct committed during the sport . . . ."[2] (*Id.* at p. 318.) Instead, "a participant in an active sport breaches a legal duty of care to other participants—i.e., engages in conduct that properly may subject him or her to financial liability—only if the participant intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport."[3] (*Id.* at p. 320, fn. omitted.)

---

[2]We assume that *Knight* speaks in terms of "ordinary careless conduct" rather than "negligent conduct" because the latter phrase connotes conduct which breaches a duty of care, and the existence of such a duty is the very issue to be decided here.

[3]As phrased, the rule is not entirely clear. For instance, it implies that a defendant has no liability for ordinary careless conduct committed by the defendant while he or she is engaged in a sport but which is *outside* the range of activity ordinarily involved in the sport. We

Still to be answered is the question of what conduct is outside the range of ordinary activity involved in a sport. For guidance, we look to the Supreme Court's stated purpose in limiting the liability of those who participate in active sports: "[I]n the heat of an active sporting event like baseball or football, a participant's normal energetic conduct often includes accidentally careless behavior. [V]igorous participation in such sporting events likely would be chilled if legal liability were to be imposed on a participant on the basis of his or her ordinary careless conduct." (*Knight, supra,* 3 Cal.4th at p. 318.) Thus, the "imposition of legal liability for such conduct might well alter fundamentally the nature of the sport . . . ." (*Id.* at p. 319, italics omitted.)

Using that policy statement as a guide, we conclude that conduct is totally outside the range of ordinary activity involved in the sport (and thus any risks resulting from that conduct are not inherent to the sport) if the prohibition of that conduct would neither deter vigorous participation in the sport nor otherwise fundamentally alter the nature of the sport.

*Bush* v. *Parents Without Partners* (1993) 17 Cal.App.4th 322 [21 Cal.Rptr.2d 178] appears to apply the same definition. There, the plaintiff had slipped while dancing after the defendants had spread soap flakes on the dance floor. The court stated that, assuming that recreational dancing was a "sport" within the meaning of *Knight,* the defendants had failed to establish the defense of primary assumption of the risk in their summary judgment motion: "[T]he nature of recreational dancing is not altered if the owners do not spread Ivory Snow Flakes on the floor. Consequently, falling on a dance floor because the operator negligently placed a slippery substance on the floor 'clearly is not a risk (inherent in the sport) that is assumed by a

question whether the Supreme Court intended to eliminate liability for all careless conduct which happens to occur in the context of participation in a sport.

The phrase "so reckless as to be totally outside the range of the ordinary activity involved in the sport" suggests both that there are varying degrees of recklessness, and that whether an activity is one which is ordinarily involved in a particular sport depends, at least in part, on the degree of recklessness with which a person engages in that activity. While negligence is frequently divided into ordinary negligence and gross negligence, recklessness is generally not similarly segregated. Moreover, we do not understand how the state of mind of the person engaging in an activity can affect whether that activity is or is not one which is ordinarily involved in a particular sport.

Finally, the rule would appear to impose no liability for conduct which is of the type which is ordinarily involved in the sport but which is engaged in recklessly. However, the cases cited as authority for the rule (*Knight, supra,* 3 Cal.4th at pp. 318-320) are to the contrary. For instance, *Gauvin* v. *Clark* (1989) 404 Mass. 450 [537 N.E.2d 94, 97] holds that a defendant is liable for athletic injuries caused by the defendant's "reckless disregard of safety."

However, we need not resolve these ambiguities because, as we shall explain, Hale has failed to demonstrate that Freeman's injuries were caused, if at all, by conduct which is ordinarily involved in the sport of skiing.

participant.' " (*Bush, supra,* at p. 329, quoting *Knight, supra,* 3 Cal.4th at p. 316; see also *Yancey* v. *Superior Court* (1994) 28 Cal.App.4th 558, 565-566 [33 Cal.Rptr.2d 777] [applying same test, but treating it as a factor separate from whether the particular conduct is an inherent risk of the sport].

### B. *Did Hale Establish Primary Assumption of the Risk?*

To be entitled to summary judgment, a moving defendant must establish "as a matter of law that none of the plaintiff's asserted causes of action can prevail." (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) A defendant may do so as to a particular cause of action by establishing, as a matter of undisputed fact, either (1) that one of the necessary elements of that cause of action does not exist, or (2) that it has a complete defense to that cause of action. (*LaRosa* v. *Superior Court* (1981) 122 Cal.App.3d 741, 744 [176 Cal.Rptr. 224].)

Since the existence of the primary assumption of the risk is dependent upon the existence of a legal duty, and since duty is an issue of law to be decided by the court, the applicability of that defense is amenable to resolution by summary judgment. (*Knight, supra,* 3 Cal.4th at p. 313.) When a defendant moves for summary judgment on the basis of implied assumption of the risk, he or she has the burden of establishing the plaintiff's primary assumption of the risk by demonstrating that the defendant owed no legal duty to the plaintiff to prevent the harm of which the plaintiff complains. (*Davis* v. *Gaschler* (1992) 11 Cal.App.4th 1392, 1398 [14 Cal.Rptr.2d 679].)

In contending that he met that burden, Hale argues that the risk of colliding with another skier is one which is inherent in the sport of skiing (*McDaniel* v. *Dowell* (1962) 210 Cal.App.2d 26, 36 [26 Cal.Rptr. 140]), that he therefore owed no duty to Freeman, and that the action against him is barred by Freeman's primary assumption of the risk.

Freeman does not dispute that her injuries were caused by the collision with Hale, or that one of the inherent risks involved in the sport of skiing is that of colliding with another skier. Instead, Freeman contends that there is a disputed issue of fact as to whether Hale's admitted consumption of alcohol before and while skiing was a contributing cause of the collision, that the consumption of alcoholic beverages is not an activity involved in the sport of skiing, and that therefore the rule of *Knight* does not provide Hale with total immunity from liability.

Thus, Hale is entitled to summary judgment on the basis of Freeman's assumption of the risk only if the consumption of alcohol is an activity which is within the range of activity ordinarily involved in skiing.[4]

We recognize that participants in many sports, including skiing, may foolishly combine the participation in their given sport with the consumption of alcoholic beverages. However, the unfortunate fact that some skiers simultaneously engage in both drinking and skiing does not mean that drinking is an activity ordinarily "involved" in skiing, as that term is used in *Knight*. As we stated above, conduct is within the range of ordinary activity involved in a sport if that conduct cannot be prohibited without deterring vigorous participation in the sport or otherwise fundamentally altering the nature of the sport.

The consumption of alcoholic beverages could be prohibited during or shortly before skiing without fundamentally altering the nature of the sport. The elimination of alcohol would not deter skiers from accepting the challenges of moguls, fast slopes, deep powder, or tight turns. To the contrary, the absence of alcoholic influence would promote vigorous participation in the sport by permitting skiers to ski to the best of their physical abilities, free of the debilitating effects of alcohol on their judgment, perceptions and reactions. We conclude, therefore, that drinking alcoholic beverages is not an activity within the range of activities "involved" in the sport of skiing, and that the increased risks presented by the consumption of alcohol are not inherent in the sport of skiing.[5]

In summary, while Hale did not have a duty to avoid an inadvertent collision with Freeman, he did have a duty to avoid increasing the risk of such a collision. (*Knight, supra,* 3 Cal.4th at pp. 315-316.) He did not

---

[4]He would also be entitled to summary judgment if he were to establish as a matter of undisputed fact that his consumption of alcohol did not causally contribute to the collision and resulting injuries. However, he did not attempt to do so.

[5]There is no direct evidence that drinking while skiing increases the risk of collision beyond that inherent in the sport. However, Freeman did submit deposition testimony from a skiing expert, who stated that drinking and skiing was "INAPPROPRIATE AND DANGEROUS. I CONSIDER DRINKING AND SKIING TO BE THE EQUIVALENT OF DRINKING AND DRIVING IF NOT PERHAPS A LITTLE WORSE." The expert went on to state that he would discourage anyone from drinking and skiing, and that alcohol and lack of sleep impair a skier's judgment.

When a court evaluates the sufficiency of a party's showing in opposition to a motion for summary judgment, his or her evidence is liberally construed. (*Molko* v. *Holy Spirit Assn., supra,* 46 Cal.3d at p. 1107; *Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785].) Furthermore, the court is to consider not only the evidence set forth in the opposing papers, but also "all inferences reasonably deducible from the evidence . . . ." (Code Civ. Proc., § 437c, subd. (c).) Considered in light of these rules, we may reasonably infer from Freeman's expert's testimony that drinking while skiing increases the risk of collision beyond that which would otherwise be present.

establish that, by drinking alcohol while he was skiing, he did not increase that risk. Nor did he establish that his consumption of alcohol was not a proximate cause of the collision. Therefore, Hale did not establish the defense of primary assumption of the risk as to all of the risks which may have contributed to Freeman's injuries.

## DISPOSITION

Since Hale's motion failed to establish that he was entitled to judgment as a matter of law, the trial court erred in granting the motion, and the erroneously entered judgment must be reversed.

Ramirez, P. J., and McDaniel, J.,* concurred.

Respondent's petition for review by the Supreme Court was denied March 2, 1995.

---

*Retired Associate Justice of the Court of Appeal, Fourth District, senior judge status (Gov. Code, § 75028.1), sitting under assignment by the Chairperson of the Judicial Council.