[No. D034614. Fourth Dist., Div. One. July 24, 2001.]

MICHAEL WILLIAM WILSON, a Minor, etc., Plaintiff and Appellant, v. COUNTY OF SAN DIEGO et al., Defendants and Respondents.

## COUNSEL

Lois Brown Kelly for Plaintiff and Appellant.

John J. Sansone, County Counsel, Diane Bardsley, Assistant County Counsel, and Deborah A. McCarthy, Deputy County Counsel, for Defendants and Respondents County of San Diego and Geraldine Flaven.

Callahan, McCune & Willis and Norma S. Marshall for Defendants and Respondents Michael Polite, Chris Johnson and Professional Resource Enterprises, Inc.

## OPINION

**NARES, J.**—In this personal injury case, we hold that defendant County of San Diego (County) and its employees did not have a mandatory duty to

prevent an adolescent from running away from Polinsky Children's Center (Polinsky), where he was placed after being taken into protective custody. Because there was no statutory basis to impose negligence liability on the defendants, we affirm summary judgments in their favor.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 15, 1998, police officers took 13-year-old Michael William Wilson (Michael) to Polinsky[1] after he telephoned 911 and reported that his grandfather, with whom he was living, was drunk and had struck him on the head with the telephone when he was trying to talk to his mother, who was incarcerated.

The following afternoon, Michael telephoned his father in Northern California and asked to be picked up from Polinsky. His father said, "I can't come and get you right now." According to the father, he was "in a relationship with a pretty special woman," was "being pulled . . . between him and her," and "couldn't have Michael all the time." Michael "got mad and said he was going to take off or that he was going to kill himself, and hung up the phone on [his father]." The father did not notify Polinsky staff about Michael's threat. That evening Michael ran away from Polinsky, unbeknownst to its staff. He was struck by a car and seriously injured when he darted onto Clairemont Mesa Boulevard.

Michael, through his father as guardian ad litem, sued County for negligence and negligent infliction of emotional distress.[2] Michael alleged that children taken into protective custody are "in extreme emotional states, frightened, paranoid, insecure, and subject to running away," and thus it was foreseeable he was at such risk and County had a duty to prevent him from running away from Polinsky. County moved for summary judgment, arguing there is no statutory basis for its liability. The court granted the motion, finding that County sustained its burden of showing that Michael "cannot establish the essential element that [it] breached a mandatory duty owed to [him]."

Michael amended his complaint to substitute parties in place of Doe defendants: Geraldine Flaven, a program administrator at Polinsky and a County employee; Professional Resource Enterprises, Inc., doing business as STAT Nurses Registry (STAT), an employment agency that provided residential care workers to Polinsky; and, Michael Polite and Christine Johnson,

---

[1] Polinsky is a facility operated by County.

[2] Michael also named the driver of the car that struck him, his grandfather and other defendants, but they are not involved in this appeal.

STAT employees who were on duty at Polinsky the evening Michael ran away.

Flaven moved for summary judgment on the grounds that her duty, as a public employee, was commensurate with County's and, in any event, she was not on duty when Michael was at Polinsky. The court granted the motion on the same ground that it granted County's motion.

STAT, Polite and Johnson subsequently obtained summary judgment on the grounds that Polite and Johnson were "special employees of . . . County by virtue of the degree of control exerted over the performance of [their] duties while employed at Polinsky." As employees of County, Polite and Johnson had no duty to prevent Michael from running away from Polinsky, and STAT could have no vicarious liability for their conduct. Judgments were entered for all defendants.

## DISCUSSION

### I

#### Standard of Review

"To prevail on [an] action [for] negligence, plaintiff must show that [the] defendants owed [him or] her a legal duty, that they breached the duty, and that the breach was a proximate or legal cause of [his or] her injuries. [Citation.]" (*Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1188 [91 Cal.Rptr.2d 35, 989 P.2d 121].) Because "duty is an issue of law to be decided by the court, the applicability of that defense [lack of duty] is amenable to resolution by summary judgment." (*Freeman v. Hale* (1994) 30 Cal.App.4th 1388, 1395 [36 Cal.Rptr.2d 418].) A de novo standard of review applies, and we must "strictly construe the moving party's papers and liberally construe those of the opposing party to determine if they raise a triable issue of material fact." (*Stimson v. Carlson* (1992) 11 Cal.App.4th 1201, 1205 [14 Cal.Rptr.2d 670].)

### II

#### Liability of Public Agencies and Their Employees

##### A

The California Tort Claims Act (Gov. Code, § 810 et seq.) bars liability against public agencies and their employees except as specifically provided

by statute. (Gov. Code, § 815.) Government Code section 815.6 provides: "Where a public entity is under a *mandatory duty imposed by an enactment* that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." (Gov. Code, § 815.6, (Italics added.) ▮ "Before the [public agency] will be required to confront a rebuttable presumption of negligence [citation], plaintiff must demonstrate that: (1) the statute which was violated imposes a mandatory duty, (2) the statute was intended to protect against the type of harm suffered, and (3) breach of the statute's mandatory duty was a proximate cause of the injury suffered. [Citations.]" (*Braman v. State of California* (1994) 28 Cal.App.4th 344, 349 [33 Cal.Rptr.2d 608].)

▮ Michael asserts that Welfare and Institutions Code[3] section 300.2 imposed a mandatory duty on County and its employees to "stop [him] as he was running away," and to "keep him safe and protected by not giving him any chance to attempt to run away." Section 300.2 states the purpose of juvenile dependency law (§ 300 et seq.) "is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm. This safety, protection, and physical and emotional well-being may include provision of a full array of social and health services to help the child and family and to prevent reabuse of children. The focus shall be on the preservation of the family as well as the safety, protection, and physical and emotional well-being of the child. . . ." (§ 300.2.)

▮ As our Supreme Court has explained, "application of [Government Code] section 815.6 requires that the enactment at issue be *obligatory,* rather than merely discretionary or permissive, in its directions to the public entity; it must *require,* rather than merely authorize or permit, *that a particular action be taken or not taken.* [Citation.]" (*Haggis v. City of Los Angeles* (2000) 22 Cal.4th 490, 498 [93 Cal.Rptr.2d 327, 993 P.2d 983], last italics added.) ▮ Section 300.2 does not require a public agency to take any *particular action.* Rather, it recites legislative goals and policies that must be implemented through a public agency's exercise of judgment. (See *Ibarra v. California Coastal Com.* (1986) 182 Cal.App.3d 687, 694 [227 Cal.Rptr. 371].) Section 300.2 cannot reasonably be interpreted to impose a mandatory duty on public agencies to guarantee the safety of dependent children in all circumstances.

---

[3]All further statutory references are to the Welfare and Institutions Code except where otherwise specified.

Moreover, Michael's duty argument is belied by the statutory requirement that public agencies place dependent minors alleged or adjudged to come within section 300 in "nonsecure" facilities, and to segregate them from minors who are detained for delinquency. (§ 206.) "The term 'nonsecure facility' means a facility that is not characterized by the use of physically restricting construction, hardware, and procedures and which provides its residents access to the surrounding community with minimal supervision." (*Ibid.*)

To comply with section 206, Polinsky adopted a written AWOL (absent without leave) policy that prohibits the physical restraint of a child over 12 years of age who is not developmentally delayed.[4] In a 1998 "Security Inspection Report," County's juvenile justice commission wrote: "It is the intent that [Polinsky] <u>not</u> be a secure lock-up facility, and it is not considered one. It is the type of setting where children must feel safe but not incarcerated as if they committed a crime. This philosophy presents issues that inhibit normal techniques of securing facilities that would resist intrusion or AWOL activity." (Original underscoring.)

Under section 206, the public agency's control over the "ingress and egress" of juvenile dependents in a nonsecure facility is characterized as being "no greater than that exercised by a prudent parent." (§ 206.) Caretakers of dependent children are said to act in loco parentis. (*In re Nicole B.* (1979) 93 Cal.App.3d 874, 880 [155 Cal.Rptr. 916].) In *Gibson v. Gibson* (1971) 3 Cal.3d 914, 922 [92 Cal.Rptr. 288, 479 P.2d 648], the court abolished parental tort immunity. However, a parent's negligence liability is typically based on a direct nexus between his or her affirmative conduct, such as the operation of a car, and the child's injury. (See *id.* at p. 921.) The *Gibson* court explained that although a parent does not have "carte blanche to act negligently toward his [or her] child," "the parent-child relationship is unique in some aspects, and . . . traditional concepts of negligence cannot

---

[4]Polinsky's AWOL policy states: "[Polinsky] does not condone runaway behavior and reasonable precautions should be taken to discourage this unacceptable method of leaving the facility. While it is recognized that for some older children running away has become an adaptive response to situational pressure, such behavior is considered high risk. For this reason it is difficult to prevent a child from running away from an unlocked facility like [Polinsky]. [¶] Staff can help minimize runaway behavior . . . . Diligent supervision, active programming, and concerned sensitive staff can and do make a difference with the majority of children. . . ."

The policy advocated AWOL prevention by having staff do such things as "build rapport with each new child who enters [Polinsky]," "be available when a child wants to talk," "be alert to AWOL plans and use active supervision techniques," "be aware of the location and change of location of each child at all times," "[o]pposing the minor by . . . creat[ing] a barrier to the child's movement," and "[f]ollowing the minor."

be blindly applied to it." (*Ibid.*) Michael cites no authority to support a contention that a parent owes a duty to an adolescent to prevent him or her from running away from home.

Michael also relies on Polinsky's "Child Care Worker Manual," which provided that "[s]taff must be alert, knowing where each child is at all times; staff is expected to supervise and maintain appropriate play activities. Children are to be within view at all times." The manual also stated that "[c]hildren must always be supervised by an authorized adult while at [Polinsky]. Under no circumstances is a child to be out of the sight of . . . staff or another designated adult unless the child is sleeping." Further, it was Polinsky's policy to assign a worker to an individual child in a variety of circumstances, including "[c]hronic AWOL behaviors."[5]

The term "enactment" as used in Government Code section 815.6 means "a constitutional provision, statute, charter provision, ordinance or regulation." (Gov. Code, § 810.6.) "This definition is intended to refer to all measures of a formal legislative or quasi-legislative nature." (Cal. Law Revision Com. com., 32 West's Ann. Gov. Code (1995 ed.) foll. § 810.6, p. 155.) The term "regulation," as used in Government Code section 810.6 means "a rule, regulation, order or standard, having the force of law, adopted . . . as a regulation by an agency of the state pursuant to the Administrative Procedure Act [Act]." (Gov. Code, § 811.6.)

■ "The . . . Act rulemaking provisions apply to *most state agencies* and their regulations. [Citations.] There are significant exceptions, however, both as to the agencies and types of regulations covered. [Citation.]" (9 Witkin, Cal. Procedure (4th ed. 1997) Administrative Proceedings, § 32, p. 1085, original italics; Gov. Code, § 11340 et seq.) For instance, the Act does not apply to "[a] regulation that relates only to the internal management of the state agency" or "[a] regulation that is directed to a specifically named person or to a group of persons and does not apply generally throughout the state." (Gov. Code, § 11340.9, subds. (d) & (i).) ■ Michael does not contend, and has not demonstrated, that Polinsky's employee manual constitutes an administrative regulation within the meaning of the Act. Accordingly, the manual imposed no mandatory duties on County or its employees. (See *Hucko v. City of San Diego* (1986) 179 Cal.App.3d 520, 522, fn. 1 [224 Cal.Rptr. 552].)

Michael's reliance on *Hoyem v. Manhattan Beach City Sch. Dist.* (1978) 22 Cal.3d 508 [150 Cal.Rptr. 1, 585 P.2d 851] is misplaced. In *Hoyem,* a

---

[5]Michael had apparently run away from Polinsky on a previous occasion.

10-year-old boy was injured after leaving the school campus without permission. The court held the school district was not exonerated from liability as a matter of law for claims that it negligently supervised the child on school grounds. The court relied on former title 5 of the California Administrative Code, section 303, which provided: " 'A pupil may not leave the school premises at recess, or at any other time before the regular hour for closing school, except in case of emergency, or with the approval of the principal of the school.' " (*Hoyem, supra,* at p. 514; Cal. Code Regs., tit. 5, § 303.) The court explained it "ha[d] no doubt that this rule is at least in part for the pupils' protection, and that the school authorities therefore bore the duty to exercise ordinary care to enforce the rule." (*Hoyem, supra,* at p. 514.) Here, County and its employees had no statutory duty to ensure that Michael not leave Polinsky. *Taylor v. Oakland Scavenger Co.* (1941) 17 Cal.2d 594 [110 P.2d 1044] and *Dailey v. Los Angeles Unified Sch. Dist.* (1970) 2 Cal.3d 741 [87 Cal.Rptr. 376, 470 P.2d 360] are similarly unhelpful.

We are sympathetic to Michael's plight. We are, however, constrained to hold that County and Flaven were entitled to summary judgment on the grounds they had no mandatory duty to prevent him from running away from Polinsky. While perhaps one-on-one care should have been provided Michael, the decision was discretionary, not mandatory.

B

██  Michael contends he raised triable issues regarding whether Polite and Johnson were independent contractors as opposed to "special employees" of County, and thus the summary judgment for them and STAT was improper. ██ "Whether a person is an employee or an independent contractor is ordinarily a question of fact but if from all the facts only one inference may be drawn it is a question of law." (*Brose v. Union-Tribune Publishing Co.* (1986) 183 Cal.App.3d 1079, 1081 [228 Cal.Rptr. 620].)

" 'An "independent contractor" is generally defined as a person who is employed by another to perform work; who pursues an "independent employment or occupation" in performing it; and who follows the employer's "desires only as to the results of the work, and not as to the means whereby it is to be accomplished." [Citations.] The most significant factor in determining the existence of an employer-independent contractor relationship is the right to control the manner and means by which the work is to be performed. [Citations.] "If control may be exercised only as to the result of the work and not the means by which it is accomplished, an independent

contractor relationship is established." [Citations.]' [Citation.]" (*Millsap v. Federal Express Corp.* (1991) 227 Cal.App.3d 425, 431 [277 Cal.Rptr. 807].)

■ "A 'special employment' relationship arises when an employer lends an employee to another employer and relinquishes to the borrowing employer all right of control over the employee's activities. [Citation.] The borrowed employee is ' "held to have two employers—his original or 'general' employer and a second, the 'special' employer." ' [Citation.]" (*Riley v. Southwest Marine, Inc.* (1988) 203 Cal.App.3d 1242, 1247-1248 [250 Cal.Rptr. 718].) During periods of "transferred control, the special employer becomes solely liable under the doctrine of respondeat superior for the employee's job-related torts." (*Marsh v. Tilley Steel Co.* (1980) 26 Cal.3d 486, 492 [162 Cal.Rptr. 320, 606 P.2d 355].) "The special employment relationship and its consequent imposition of liability upon the special employer flows from the borrower's power to supervise the details of the employee's work." (*Ibid.*)

■ The trial court determined that "defendants have established, and plaintiff has failed to controvert, that Polinsky controlled and directed the essential duties of defendant's work. . . ." (Original capitalization omitted.) We agree with this assessment. In declarations, Polite and Johnson stated they (1) received their work schedules and daily work assignments from Polinsky, (2) "received training in the performance of [their] duties as . . . residential care worker[s] from County employees,"[6] (3) were "expected to follow and implement . . . County . . . policies and procedures for Polinsky," (4) were "under the supervision and received direction in performance of [their] duties from a Residential Care Supervisor and other County employees in supervisory positions," and (5) were not supervised by STAT in the performance of their work at Polinsky. An employee supervisor at Polinsky testified in deposition that workers provided by STAT "were supervised in the same manner as any County employee."

Michael offered no evidence suggesting County did not control the manner and means by which Polite and Johnson performed their work. Evidence that STAT contracted to provide County a "certain number of man hours of work per year" and assigned Polite and Johnson to Polinsky does not create a triable issue of material fact.

The court correctly determined that Polite and Johnson were "special employees" of County. Accordingly, as with the County and Flaven, no duty

---

[6]Michael asserts that "[t]here was no job training at [Polinsky], only staff and resident interaction." However, in his responsive separate statement, Michael conceded it was undisputed that "Johnson and Polite received training to perform their job duties from . . . County."

to prevent Michael from running away from Polinsky can be attributed to Polite, Johnson or STAT.

DISPOSITION

The judgments are affirmed.

Benke, Acting P. J., and Huffman, J., concurred.