Filed 11/23/22

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| RAQUEL OLSON,<br><br>      Plaintiff and Appellant,<br><br>      v.<br><br>LA JOLLA NEUROLOGICAL ASSOCIATES et al.,<br><br>      Defendants and Respondents. | D079265<br><br><br><br>(Super. Ct. No. 37-2018-00051604-CU-MC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Kazerouni Law Group and Ryan L. McBride, for Plaintiff and Appellant.

Hegeler & Anderson, Barton H. Hegeler, Storm P. Anderson, and Keshav S. Nair, for Defendants and Respondents.

Dr. Frank Coufal and his solely owned professional corporation, La Jolla Neurological Associates (LJNA), hired an unaffiliated, third-party billing service to collect payments from patients and their insurers.  Raquel Olson, the widow of a former patient, sued the doctor and his corporation (but not the third-party billing service) for unlawful debt collection under the Rosenthal Fair Debt Collection Practices Act (the Rosenthal Act; Civ. Code,

§ 1788 et seq.).[1] The trial court granted a defense motion for summary judgment on the ground that the doctor and his medical corporation were not "debt collectors" within the meaning of the Rosenthal Act. (§ 1788.2, subd. (c).) We agree and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Complaint*

In October 2018, Olson sued Dr. Coufal and LJNA for unfair debt collection under the Rosenthal Act. The complaint alleged that Dr. Coufal is the president, owner, and sole treatment provider of LJNA.

The complaint alleged that Dr. Coufal and LJNA were both " 'debt collector[s]' " within the meaning of the Rosenthal Act. It further alleged that Dr. Coufal was "actively involved in the business affairs of Defendant LJNA, including, but not limited to, its collection of Accounts Receivable."

According to the complaint, Dr. Coufal and LJNA violated the Rosenthal Act by sending multiple bills and making incessant phone calls seeking payment for neurological services Dr. Coufal had provided to Olson's husband before he died, even though Olson directed them to stop contacting her and to seek payment through Medicare and the VA Medical Center.

Olson's complaint did not mention any third-party debt billing service or debt collector and did not allege that Dr. Coufal or LJNA were vicariously liable for the actions of any such third party.

B. *Summary Judgment Motion*

Dr. Coufal and LJNA filed a summary judgment motion on two grounds: (1) they were not " debt collector[s]' " as defined in the Rosenthal

---

[1]    Further statutory references are to the Civil Code unless otherwise indicated.

2

Act; and (2) they never made any attempt at " 'debt collection' " as defined in the Rosenthal Act.

Dr. Coufal is a board-certified neurosurgeon in private practice. He provides neurosurgical services to patients through his own professional corporation, LJNA. LJNA only provides medical services. Dr. Coufal is solely responsible for the delivery of neurosurgical services to LJNA's patients. His daily schedule is dedicated solely to clinical practice and patient care.

LJNA accepts insurance co-payments directly from outpatients when services are provided. After services are provided, however, LJNA uses unaffiliated, third-party billing services to seek payment from patients and/or their insurance companies for medical services rendered. LJNA does not bill patients directly for monies owed by insurance companies for inpatient and outpatient neurosurgical services. Once LJNA provides the neurosurgical services and obtains insurance information from a patient, it gives the relevant information to its third-party billing service, which thereafter seeks payment from the patients' insurers. LJNA does not determine the prices for its services, which vary by insurance company and contract. According to Dr. Coufal, his medical practice has never acted as a debt collector.

In February 2017, Dr. Coufal provided emergency neurosurgical services to Richard Olson for a hemorrhagic stroke. At the time, LJNA was using McKesson as its third-party billing service. LJNA later retained billing service WRS to take over the billing services from McKesson.

In March 2018, WRS generated an invoice seeking payment for the medical services provided to Mr. Olson and sent it to him at his home address. WRS determined the monetary value for the services rendered based on the information provided by LJNA. The invoice included LJNA's

3

return address and gave no indication that it was being sent by WRS. It included language stating, "Payment Due Upon Receipt" and "PLEASE PAY." The bill was for $1,713.54.

In April 2018, LJNA received unsigned correspondence from "The Olson Family" in response to the March 2018 invoice. The correspondence stated that payment inquiries for Mr. Olson should only be submitted to Medicare Part I and VA Medical Center. However, the correspondence did not provide an identification number, social security number, or policy number, and did not state that Mr. Olson was deceased. The correspondence also included a handwritten notation: "This considered harassment. (*Sic*.) I know the [l]aw, [d]o you?"

Over the next few months, LJNA received copies of the same correspondence from "The Olson Family" with different handwritten messages but no identified author or sender. The sender never provided any identification number, social security number, or policy number. In one of the messages, the sender filled out a change of information form stating that Mr. Olson "[doesn't] exist anymore," his street address was "Miramar Cemetery," and his employer was "God in Heaven." Under "Marital Status," the sender crossed out all the existing boxes on the form and inserted a new box for "Dead." LJNA forwarded the correspondence to WRS.

In June 2018, WRS asked LJNA for assistance in contacting Mr. Olson to obtain insurance information for payment of his bill. An employee of LJNA left a voicemail at the Olson house requesting his insurance information. Other than to request insurance information, LJNA made no attempt to discuss the outstanding balance or solicit payment. Mrs. Olson returned the call and reported that her husband had died. She said it was her understanding that all charges had been paid by the VA.

4

In September 2018, insurance paid LJNA the outstanding balance totaling $1,713.54 owed on behalf of Mr. Olson. Olson filed this lawsuit the following month.

A medical billing expert and a collections attorney provided expert declarations stating their opinions that Dr. Coufal and LJNA were not debt collectors and were not attempting to collect a debt when they contacted the Olson household for insurance information.

C. *Summary Judgment Opposition*

In opposition, Olson argued: (1) Dr. Coufal and LJNA were " 'debt collector[s]' " as defined in the Rosenthal Act; (2) Dr. Coufal and LJNA tried to collect a " 'consumer debt' " from Olson as defined in the Rosenthal Act; (3) LJNA was vicariously liable for its own employees' conduct; and (4) LJNA was vicariously liable for the actions of WRS "through agency theory since the third-party billing companies were acting under the direction and control of LJNA as an agent." Olson did not argue any agency theory based on apparent authority or ratification.

Olson tried to lodge exhibits in opposition to the summary judgment motion, but they were rejected by the court. After the court's initial ruling granting summary judgment, the court granted Olson's motion for reconsideration so that it could consider her exhibits. We therefore summarize Olson's exhibits in opposition to the summary judgment motion.

In deposition, Dr. Coufal testified that he used third-party billing services to send bills to patients. He had worked with several different third-party billing services, including McKesson and WRS. Dr. Coufal selected McKesson and WRS based on their online advertising and his interviews with their representatives. By the time of Dr. Coufal's deposition, however,

LJNA was no longer using McKesson or WRS; it was using a different billing service recommended by some of his neurosurgical colleagues.

LJNA's operations manager, Sarah Ince, confirmed that LJNA's normal process for selecting a third-party billing service was to look up its reviews. LJNA stopped using WRS because its software was not efficient, and WRS did not specialize in neurosurgery billing.

For each patient, LJNA provided its third-party billing service with a "CPT code"[2] to indicate how much time was spent, how complex the procedure was, and what the diagnosis was. The billing service would then decide how much to bill and provide the relevant information to the insurance company.

LJNA accepted co-payments from patients at its office. When patients received a bill from the third-party billing service, they could also send payment directly to LJNA by check. LJNA would then inform the third-party billing service of the payment.

WRS sent invoices for the services LJNA provided to Mr. Olson to his home address in March, April, May, June, and July 2018. WRS generated these invoices, not LJNA.

D. *Trial Court Rulings and Judgment*

As noted, the trial court initially granted summary judgment without considering the rejected exhibits Olson had tried to lodge in opposition. In a

---

[2]     "CPT" stands for Current Procedural Technology. (*YDM Management Co., Inc. v. Sharp Community Medical Group, Inc.* (2017) 16 Cal.App.5th 613, 617.) CPT codes are published annually by the American Medical Association and comprise a comprehensive list of medical, surgical, and diagnostic services that is widely used in the healthcare industry. (*Id*. at p. 617, fn. 1.) By using these codes in bills to insurance companies or patients, a medical services provider represents that it has rendered the type of services described by the codes used. (*Ibid*.)

minute order, the court found that LJNA and Dr. Coufal were not debt collectors and were not engaged in debt collection.

Based on the court's order, the clerk on January 8, 2021 recorded judgment in the register of actions as follows: "Judgment recorded for Coufal, MD, Frank; La Jolla Neurological Associates and against Olson, Raquel for $0.00, punitive damages: $0.00, attorney fees: $0.00, interest: $0.00, prejudgment costs: $0.00, other costs: $0.00, amount payable to court: $.00, for a grand total of $0.00." However, there was no corresponding document filed with the court.

Dr. Coufal and LJNA filed an ex parte application to correct the judgment for clerical error to reflect that it was in favor of both "Frank Coufal" and "Frank Coufal, M.D." (who are one and the same). The court granted the application to correct the judgment by minute order on February 17, 2021.

On February 8, 2021, Olson filed a motion for reconsideration of the summary judgment ruling, asking the court to consider the exhibits she had unsuccessfully tried to lodge in opposition.

On July 16, 2021, the court granted reconsideration and agreed to consider Olson's exhibits, but concluded that "they do not change the outcome of the summary judgment motion." The court explained: "The exhibits confirm that defendant uses a third[-]party billing service and is not a debt collector within the meaning of the Rosenthal . . . Act." "Dr. Coufal's ordinary course of business is providing neurosurgical care to patients. It does not appear that, in the ordinary course of business, he regularly, engages in debt collection. Likewise, LJNA . . . provides neurosurgical services. LJNA is not a debt collector under the above standard." The court further concluded that LJNA's attempt to "assist their third-party billing service with obtaining

7

information that would allow for insurance to be appropriately charged for services rendered" did not constitute " 'debt collection' " or make it a " 'debt collector' " under the Rosenthal Act.

On July 27, 2021, Olson filed a notice of appeal without specifying the date of the order being appealed. The notice of appeal stated that Olson was appealing from a judgment after an order granting a summary judgment motion and a judgment after a motion for reconsideration of the summary judgment order. We issued a notice to Olson requesting that she obtain a final judgment. Our notice also stated that we would construe the notice of appeal as being from the final judgment.

On August 23, 2021, the court signed and filed a final judgment against Olson.

DISCUSSION

I

We requested supplemental briefing from the parties to address whether the clerk's January 8, 2021 notation in the register of actions recording judgment against Olson constituted a valid entry of judgment without the filing of a corresponding document, and if so, whether it deprived the trial court of jurisdiction to consider Olson's motion for reconsideration and rendered this appeal untimely as to the original summary judgment ruling.

We now conclude that the clerk's notation alone was not a valid judgment in the absence of a corresponding file-stamped document. Under the traditional method for " 'entering' " a civil judgment in California, the clerk made a notation in a book known as the " 'judgment book.' " (*Palmer v. GTE California, Inc.* (2003) 30 Cal.4th 1265, 1267, fn. 2; Code Civ. Proc., § 668.) In 1974, however, the Legislature provided an alternative method for

8

entering a judgment under Code of Civil Procedure section 668.5. (*Palmer*, at p. 1267, fn. 2.) That statute now provides: "In those counties where the clerk of the court places individual judgments in the file of actions and either a microfilm copy of the individual judgment is made, or the judgment is entered in the register of actions, or into the court's electronic data-processing system, prior to placement of the judgment in the file of actions, the clerk shall not be required to enter judgments in a judgment book, *and the date of filing the judgment with the clerk shall constitute the date of its entry*." (Code Civ. Proc., § 668.5, italics added.)

San Diego County no longer uses a judgment book. (*Dodge v. Superior Court* (2000) 77 Cal.App.4th 513, 518, fn. 6.) In San Diego County, judgments are entered upon filing in accordance with Code of Civil Procedure section 668.5. (*Dodge*, at p. 518 & fn. 6, citing San Diego Super. Ct. Press Release (May 30, 1995) [date of entry of judgment].) "In courts where judgments are entered immediately upon filing, a file-stamped copy of the judgment gives notice of the fact and date of its entry." (*Dodge*, at p. 518.)

Under Code of Civil Procedure section 668.5, the clerk's mere recording of judgment in the register of actions on January 8, 2021 did not constitute entry of judgment in the absence of a corresponding file-stamped judgment. By its terms, the statute states that "the date of *filing* the judgment with the clerk shall constitute the date of its entry." (Code Civ. Proc., § 668.5, italics added; see also Cal. Rules of Court, rule 8.104(c)(1) ["The entry date of a judgment is the date the judgment is filed under Code [Civ. Proc., §] 668.5, or the date it is entered in the judgment book."].) "The 'entry' date does *not* depend on when—or even *if*—the judgment was entered in a register of actions *or* electronic data-processing system, *or* when or if it was microfilmed." (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs

9

(The Rutter Group 2021) ¶ 3:46, pp. 3-24 to 3-25, citing *Ten Eyck v. Industrial Forklifts* (1989) 216 Cal.App.3d 540, 543-545.) Thus, the clerk's mere act of recording judgment in the register of actions did not by itself result in the entry of judgment.

Because there was no judgment entered on the original summary judgment order in January 2021, the trial court retained jurisdiction to reconsider the order. (*Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1107–1109 [courts have inherent power to reconsider interim rulings before entry of judgment]; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 859, fn. 29 [courts lose jurisdiction to entertain or decide a motion for reconsideration after entry of judgment].) After reconsidering and reaching the same result, the court entered a proper final judgment on August 23, 2021. Although Olson filed her notice of appeal prematurely before entry of the August 23, 2021 judgment, we stated in our notice of August 9, 2021 that we would construe her notice of appeal as being from the later-filed judgment. (See *Mukthar v. Latin American Security Service* (2006) 139 Cal.App.4th 284, 288 ["the appellate court may deem the premature notice of appeal to have been filed after the entry of judgment"].) Accordingly, the appeal was timely filed and we must consider the merits.

II

On the merits, Olson argues that: (1) Dr. Coufal and LJNA are directly liable as " 'debt collector[s]' " under the Rosenthal Act; and (2) Dr. Coufal and LJNA are vicariously liable for the actions of WRS under agency theories. Based on our independent review, we find that Dr. Coufal and LJNA met their initial summary judgment burden of demonstrating that they are not debt collectors, and Olson failed to show a triable issue of material fact on the

10

issue.  (Code Civ. Proc., § 437c, subd. (c).)  We also conclude that Olson failed to demonstrate a triable issue of material fact on agency liability.

A.  *Standard of Review*

We review a summary judgment order de novo applying the same three-step process as the trial court.  (*Ryan v. Real Estate of Pacific, Inc.* (2019) 32 Cal.App.5th 637, 642.)  First, we look to the pleadings to identify the elements of the causes of action.  (*Ibid.*)  Second, for a motion brought by a defendant, we examine the supporting evidence to determine whether it satisfies the moving party's initial burden of demonstrating that one or more elements cannot be established or there is a complete defense.  (*Ibid.*)  If so, we then examine the opposing evidence to determine whether the plaintiff has demonstrated the existence of a triable issue of material fact precluding summary judgment.  (*Ibid.*)

B.  *No Triable Issue of Material Fact on Direct Liability as "Debt Collectors"*

Enacted in 1977, the Rosenthal Act was intended "to prohibit debt collectors from engaging in unfair or deceptive acts or practices in the collection of consumer debts."  (§ 1788.1, subd. (b).)  The Rosenthal Act prohibits specified acts by debt collectors (§§ 1788.10-1788.16) and requires them to comply with provisions of the federal Fair Debt Collections Practices Act (FDCPA) (15 U.S.C. § 1692 et seq.), which was enacted the same year. (§ 1788.17.)

The Rosenthal Act defines a " 'debt collector' " as "any person who, in the ordinary course of business, regularly, on behalf of that person or others, engages in debt collection."  (§ 1788.2, subd. (c).)  It defines " 'debt collection' " as "any act or practice in connection with the collection of consumer debts" (*id.*, subd. (b)); it defines " 'consumer debt' " as "money, property, or their equivalent, due or owing or alleged to be due or owing from a natural person by reason of a consumer credit transaction" (*id.*, subd. (f)); and it defines

11

" 'consumer credit transaction' " as "a transaction between a natural person and another person in which property, services, or money is acquired on credit by that natural person from the other person primarily for personal, family, or household purposes."[3] (*Id.*, subd. (e).)

The Rosenthal Act's definition of a " 'debt collector' " differs from the federal FDCPA in that it includes one who engages in debt collection "on behalf of that person" as well as "others." (§ 1788.2, subd. (c).) Under the FDCPA, by contrast, "a debt collector is defined as only an entity that collects debts due to another." (*Moya v. Chase Cardmember Service* (N.D. Cal. 2009) 661 F.Supp.2d 1129, 1132, citing 15 U.S.C. § 1692a(6).)

Olson's complaint alleged that Dr. Coufal and LJNA were directly liable as " 'debt collector[s]' " under the Rosenthal Act. In support of their summary judgment motion, Dr. Coufal and LJNA submitted evidence establishing that they do not personally engage in debt collections for themselves or others; they hire unaffiliated third-party billing services to collect balances due from patients and/or insurance companies; and their only business is providing neurosurgical services to patients. As the trial court noted on reconsideration, Olson's evidence in opposition confirmed that LJNA uses a third-party billing service to send out invoices and seek payment for neurosurgical services rendered to patients. Thus, the legal question before us is whether a medical service provider that exclusively uses an unaffiliated, third-party billing service to collect payment for services rendered to patients is a " 'debt collector' " within the meaning of the Rosenthal Act.

_____

[3] The Rosenthal Act does not define the phrase " 'on credit.' " (*Davidson v. Seterus, Inc.* (2018) 21 Cal.App.5th 283, 296.) Based on common dictionary definitions, however, we have construed it to mean "obtaining something of value without immediate payment on the promise to make a payment or payments in the future." (*Ibid.*)

12

We conclude that the answer is no. Although the Rosenthal Act applies to those who collect debts on behalf of themselves, it requires that the defendant must regularly and in the ordinary course of business "engage[] in" debt collection. (§ 1788.2, subd. (c).) "To engage in is to be occupied in, to be employed in." (*People v. Nocita* (1954) 123 Cal.App.2d 55, 59, citing *People v. Coppla* (1950) 100 Cal.App.2d 766, 768; see also Black's Law Dict. (11th ed. 2019) p. 669, col. 2 [defining "engage" to mean "[t]o employ or involve oneself; to take part in; to embark on"].) To "engage in" an activity does not ordinarily mean to hire someone else to do it; it means to take part in doing it oneself. Thus, the most natural reading of the statutory language is that a "debt collector" must personally participate in consumer debt collection— either on behalf of himself or herself or others.

To the extent there is any ambiguity in the statutory language, the legislative history bolsters our interpretation. The Rosenthal Act was "intended to provide public protection against unregulated debt collectors." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 237 (1977-1978 Reg. Sess.) as amended May 11, 1977, p. 2; hereinafter referred to as Analysis.) Before 1977, the Collection Agency Act (former Bus. & Prof. Code, § 6850 et seq.) only applied to debt collection agencies licensed by the Bureau of Collection and Investigative Services. (Analysis, at pp. 1–2.) The proponents of the Rosenthal Act were concerned that "abuses in debt collection practices" were being committed by "unregulated debt collectors," specifically in-house collectors. (Analysis, at p. 2.) "For example, Penney's may employ an in-house collection service which services Penney's only. Such an in-house service is not presently regulated, yet abuses are alleged to be occurring." (*Id.* at p. 3.)

13

As explained by the Department of Consumer Affairs in an enrolled bill report: "Licensed collection agencies are responsible for about 10% of the debt collection in California. The other 90% is performed by in-house collectors (for banks, retailers, finance companies, and so on)." (Dept. Consumer Affairs, Enrolled Bill Rep. on Sen. Bill No. 237 (1977-1978 Reg. Sess.) Sept. 15, 1977, p. 1.) "The Act would thus apply to debt collectors licensed by the Bureau of Collection and Investigative Services (CIS) and to in-house collectors . . . ." (*Ibid*.)[4]

This legislative history confirms that the Legislature intended to expand protections against abusive debt collection practices to previously unregulated *in-house* debt collectors. But nothing in the language or legislative history of the statute suggests that the Legislature also intended to impose direct liability on creditors who exclusively use unaffiliated *outside* entities for debt collection. We conclude that such a creditor is not "engage[d] in" debt collection within the meaning of the Rosenthal Act. (§ 1788.2, subd. (c).)

This result is also supported by our prior opinion in *Cavalry SPV I, LLC v. Watkins* (2019) 36 Cal.App.5th 1070 (*Cavalry*). There, we agreed with a federal district court "that a debt holding entity may be a ' "debt collector" ' if it indirectly collects debts through a separate entity *where the two entities together form an interdependent* ' "*single economic enterprise*." ' " (*Id.*, at p. 1086, italics added & quoting *Gold v. Midland Credit Mgmt.* (N.D.Cal. 2015) 82 F.Supp.3d 1064, 1072.) We also found "ample evidence" that a debt

---

4       On our own motion, we take judicial notice of the legislative history materials cited in this opinion under Evidence Code sections 452, subdivision (c) and 459. (See *Gananian v. Wagstaffe* (2011) 199 Cal.App.4th 1532, 1541, fn. 9 ["We may take judicial notice of legislative history materials on our own motion."].)

holder and its associated collection agency formed such a single economic enterprise, because they operated under common ownership pursuant to an agreement under which debts purchased by the former were immediately placed with the latter for collection; they were closely related; the associated entity was acting under the direction of the debt purchaser; and the debt purchaser itself set the allegedly improper interest-charging policy. (*Ibid.*)

*Cavalry* makes clear that a creditor using a separate entity to collect its debts may be treated as a debt collector *if* there is evidence that the creditor and debt collector are part of a single economic enterprise. (*Cavalry*, *supra*, 36 Cal.App.5th at p. 1086.) Yet Olson made no such showing here. The undisputed evidence is that Dr. Coufal and LJNA used unaffiliated, third-party billing services, which they selected based on online advertising, customer reviews, interviews, and referrals. There is no evidence that LJNA and WRS were affiliated with one another, operated under common ownership, or were otherwise part of a single economic enterprise. The mere fact that LJNA provided WRS with certain basic information for WRS to perform its billing services—such as CPT codes and time spent with each patient—does not transform LJNA itself into a debt collector. Nor does the one phone call LJNA placed to the Olson household seeking Mr. Olson's insurance information.

We therefore conclude that Dr. Coufal and LJNA met their initial summary judgment burden of demonstrating that they were not directly liable as " 'debt collector[s]' " within the meaning of the Rosenthal Act, and Olson failed to demonstrate a triable issue of material fact on this issue.

C. *No Triable Issue of Material Fact on Agency Liability*

Olson argues in the alternative that Dr. Coufal and LJNA are vicariously liable for the conduct of WRS under theories of agency. Olson did

15

not allege any such theory of vicarious liability in her complaint, but she did argue in her summary judgment opposition that LJNA was vicariously liable for the conduct of its billing service because WRS was acting as LJNA's agent with actual authority. Because Dr. Coufal and LJNA addressed this argument on the merits in their reply brief below, and did not object that it was beyond the scope of the pleadings, we must likewise consider it on the merits. (*Kaney v. Custance* (2022) 74 Cal.App.5th 201, 213, fn. 12 [defendant waives objection to new theories asserted in summary judgment opposition by briefing them on the merits without objection in reply brief].)

We conclude that Olson failed to demonstrate a triable issue of fact on this theory of agency liability. Although we have discovered no California case law on point, "[m]any [federal] courts have held that debt collectors are independent contractors for purposes of the FDCPA." (*Browning v. AT&T Corp.* (N.D.Ill. 2009) 682 F.Supp.2d 832, 839–840, citing *Frascogna v. Wells Fargo Bank, N.A.* (S.D.Miss. Aug. 31, 2009, No. 3:07CV96DPJ-JCS) 2009 U.S.Dist.Lexis 77774 [citing cases]; see also *Randolph v. IMBS, Inc.* (7th Cir. 2004) 368 F.3d 726, 729 ["debt collectors are independent contractors"]; *Teng v. Metropolitan Retail Recovery* (E.D.N.Y. 1994) 851 F.Supp. 61, 67 (*Teng*) [debt collector "was an independent contractor" because "there was no evidence" that it "was in any way subject to [creditor's] control with regard to its conduct in the actual performance of the debt collection work"].)

Subject to certain exceptions not relevant here, a hirer is not vicariously liable for the conduct of an independent contractor it employs, even when the independent contractor is acting within the scope of its employment. (*Bowman v. Wyatt* (2010) 186 Cal.App.4th 286, 299, citing *S.G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 350 ["The distinction between independent contractors and employees

16

arose at common law to limit one's vicarious liability for the misconduct of a person rendering service to him."].) Although we have acknowledged that "a creditor can be held vicariously liable *for the actions of an agent* collecting a debt on its behalf under the Rosenthal Act" (*Cavalry*, *supra*, 36 Cal.App.5th at p. 1085, italics added), the Act does not impose vicarious liability on a creditor for the actions of an independent contractor who is *not* the creditor's agent.

The most important factor in distinguishing an agent from an independent contractor is whether the principal has a right to control the manner and means by which the work is to be performed. (*Wilson v. County of San Diego* (2001) 91 Cal.App.4th 974, 983.) "The right to control *the result* is inherent in both independent contractor relationships and principal-agency relationships; it is the right to control the means and manner in which the result is achieved that is significant in determining whether a principal-agency relationship exists." (*Wickham v. Southland Corp.* (1985) 168 Cal.App.3d 49, 59.) If control may be exercised only as to the result of the work, and not the means by which it is accomplished, the relationship is an independent contractor relationship rather than an agency. (*Millsap v. Federal Express Corp.* (1991) 227 Cal.App.3d 425, 431.)

" 'Agency and independent contractorship are not *necessarily* mutually exclusive legal categories . . . . In other words, an agent may also be an independent contractor.' " (*Jackson v. AEG Live, LLC* (2015) 233 Cal.App.4th 1156, 1184.) However, the party asserting that an independent contractor is also an agent bears the burden of proving the existence of an agency relationship. (See *Inglewood Teachers Assn. v. Public Employment Relations Bd.* (1991) 227 Cal.App.3d 767, 780 [burden of proving agency rests on party asserting its existence].) The law indulges in no presumption that an agency

exists, but instead presumes that a person is acting for himself or herself and not as an agent of another. (*Jackson*, at p. 1184.)

Olson presented no evidence that WRS was acting as an agent of LJNA, rather than just an independent contractor. There is no evidence in the record that WRS was subject to the control of LJNA in the manner and means of its work. Specifically, there was no showing that LJNA exercised control over WRS "with regard to its conduct in the actual performance of the debt collection work." (*Teng*, *supra*, 851 F.Supp. at p. 67 [creditor not vicariously liable for conduct of debt collector who "was an independent contractor"].) Olson also presented no evidence of the actual agreement between LJNA and WRS or its terms. On this record, therefore, we conclude that Olson failed to meet her burden of demonstrating a triable issue of material fact on agency liability. (See *Colo. Capital v. Owens* (E.D.N.Y. 2005) 227 F.R.D. 181, 188 ["since [creditor's] debt collectors are independent contractors, [creditor] cannot be held vicariously liable . . . for their actions"].)

We emphasize that we are not holding a creditor may *never* be vicariously liable for the actions of a debt collector on an agency theory. In some circumstances, a debt collector may act as a creditor's agent, depending on the nature of their relationship and the level of control the creditor exercises over the debt collector's operations. But it was Olson's burden to demonstrate a triable issue of material fact on the existence of such an agency relationship, and she failed to do so on this record.

On appeal, Olson also asserts two other theories of agency liability based on apparent authority and ratification. She did not argue either of these theories in her opposition to the summary judgment motion; she only argued agency liability on a theory of actual authority. In a summary judgment appeal, a party is ordinarily not permitted to change her position

18

and adopt a new and different theory.  (*DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 676.)  A new theory on appeal is waived if it involves controverted facts not put in issue below.  (*City of San Diego v. Rider* (1996) 47 Cal.App.4th 1473, 1493.)  Because Olson's new theories of apparent authority and ratification depend on controverted facts not put in issue below, we find that she has waived her reliance on them.

## DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.


BUCHANAN, J.

WE CONCUR:



AARON, Acting P. J.



IRION, J.

19