[No. G033133. Fourth Dist., Div. Three. Nov. 19, 2004.]

MARY ANN HEAPS, as Trustee, etc., Plaintiff and Appellant, v.
WILLIAM RUSSELL HEAPS et al., Defendants and Respondents.

FRANK CIOTTI, as Cotrustee, etc., et al., Plaintiffs and Respondents, v.
MARY ANN HEAPS, Defendant and Appellant.

---

**COUNSEL**

Sacks, Glazier, Franklin & Lodise, Margaret G. Lodise and Matthew W. McMurtrey for Plaintiff and Appellant and for Defendant and Appellant.

The Kiken Group and Dale A. Kiken for Defendants and Respondents and for Plaintiffs and Respondents.

**OPINION**

**SILLS, P. J.—**

## I. INTRODUCTION

This case illustrates the sort of unexpected complications that can arise from the so-called living trusts, which are hawked so aggressively these days. The bottom line here is that the casual use of a living trust as a quickie estate planning device meant that a husband was worth a lot less than his second wife thought he was worth when she married him. Unbeknownst to her, the husband's erstwhile assets had already been tied up for the first wife's children because of an overly broad clause involving how the trust would hold title. As we explain below, the import of that clause is that it meant that removing an asset from the trust required something—anything really—more than just taking title in one's own name. We will therefore affirm a judgment which requires the second wife to pay over assets that she thought were the husband's, and later thought were hers, to the first wife's children.

## II. BACKGROUND

In 1985, during the course of a long marriage, George and Barbara Heaps—the husband's first wife—executed a revocable living trust with both spouses acting as their own trustees. The trust would, however, become irrevocable with the death of one of the original trustors. Upon that death, the trust was to be split into two trusts: a "family" trust consisting of the maximum amount of assets that would pass to the "estate of the Trustor" free of estate tax and a "marital" trust for the remainder. George and Barbara's son William Heaps and son-in-law Frank Ciotti would join the survivor as co-trustees of the family trust, but the surviving spouse would remain sole trustee of the marital trust. The trust also provided that the surviving spouse would have the right to an annual principal invasion of the assets of the *family* trust, up to the greater of 5 percent of the assets or $5,000. However, to make that invasion, the trust (section 3.06 to be specific) required the surviving spouse to first "make such request on or before December 1 of each year only."

This case concerns the only important asset put into that trust, a residence on Circle Haven owned by George and Barbara at the time the trust agreement was made. Title to the Circle Haven property was transferred to the trust via quitclaim deed in 1985. The quitclaim deed transferring the property to the trust was, however, never recorded. It was just given to George and Barbara's attorney.

Barbara would live another nine years, and die in 1994. But four years before her death in 1990, George and Barbara sold the Circle Haven property for $320,000. In return for the Circle Haven property, George and Barbara got back a note and an all-inclusive deed of trust in the amount of $236,000, *title to which was taken as joint tenants.*

Of course, taking title as joint tenants was, in retrospect, to be expected: Since the quitclaim deed to the trust was never recorded, the buyers of the Circle Haven property would have no reason to expect to receive title *from* the trust. As far as the buyers were concerned, title was directly in the names of George and Barbara as joint tenants.

There is no question that on Barbara's death the trust became irrevocable. The question on which this case turns is, rather, whether the proceeds from the sale of the Circle Haven property were still *in* the trust as of Barbara's death in 1994.

If those proceeds were property of George and Barbara individually, then the actions of George and his second wife Mary Ann, whom he married a few months after Barbara's death in February, were perfectly legitimate. Those actions were these: In 1996, George and his second wife Mary Ann created their own family trust, and executed a quitclaim deed to transfer any interest in the Circle Haven property and in the all-inclusive trust deed received in return for that property to that new trust. What's more, after George died in 2002—in fact, during the pendency of this very case—Mary Ann transferred all the assets from the 1996 trust to her own revocable trust.

However, if the proceeds were still in the 1985 trust, the 1996 and 2002 transfers were, in effect, conversions of property not belonging to George or Mary Ann. For what it is worth, there is no evidence in the record that George himself ever treated the 1985 trust as having any force or validity after Barbara's death.

### III.  TERMS OF THE TRUST

Two clauses in particular bear on the question of whether, by taking title as joint tenants, George and Barbara took the proceeds of the Circle Haven property out of the trust. We now quote them verbatim.[1]

---

[1] Except that underlines in the original have been deleted and any italicized words are our own emphasis.

First is the portion of the trust agreement involving amendment:

"Section 1.06 Amendment and Revocation

"At any time during the joint lives of the Trustors, jointly as to Community Property and individually as to his or her own separate property, Trustors may, *by a duly executed instrument,*

"a) Amend this trust agreement (including its technical provisions) in any manner and/or

"b) Revoke this trust agreement in part or in whole, in which latter event any and all trust properties shall forthwith revert to such Trustor free of trust. Such instrument of amendment or revocation shall be effective immediately upon its proper execution by Trustor(s), but *until a copy has been received by a trustee,* that Trustee shall not incur any liability or responsibility either (i) for failing to act in accordance with such instrument or (ii) for acting in accordance with the provisions of this trust agreement without regard to such instrument." (Italics added.)

Second is the portion of the trust agreement concerning holding title:

"Section 5.06 Manner of Holding Title

"The Trustee may hold securities or other property held by Trustee in trust pursuant to this Declaration in Trustee's name as Trustee under this Declaration, in *Trustee's own name without a designation showing it to be Trustee under this Declaration,* in the name of Trustee's nominee, or the Trustee may hold such securities unregistered in such condition that ownership will pay by delivery." (Italics added.)

## IV. DISCUSSION

### A. *The Terms of the Trust Agreement Require Something More to Take Property Out of the Trust Than a Mere Change in Title*

The basic rule governing the interpretation of these clauses is exceedingly simple: "The whole of a contract is to be taken together, so as to *give effect to every part,* if reasonably practicable, each clause *helping to interpret the other.*" (Civ. Code, § 1641, italics added.)

At oral argument, counsel for Mary Ann eloquently argued that pulling assets out of living trusts should not be difficult for people who are both the

trustees and beneficiaries of such a trust. And that idea certainly makes sense in the abstract, and dovetails nicely with her central legal theory, which is that merely by taking *title* to the proceeds as joint tenants, George and first wife Barbara were exercising the power they necessarily had to pull assets out of the trust.

But the theory fails because the only way we can "give effect to every part" is to interpret the trust agreement to require, when assets are being withdrawn from the trust, something—anything in fact—*in addition* to merely taking title in a form that would be in some name other than the trust's.

The first clause, section 1.06, is fairly prosaic. A "duly executed instrument" was needed to amend the trust. Since George and Barbara were their own trustees, presumably a signed memo to themselves purporting to amend the trust would have been sufficient.[2]

But the second clause, section 5.06, is a landmine, ostensibly buried in the trust agreement to make it easy and convenient for the trust to hold property—but in the end, too easy and convenient. By saying that title to trust property could be held *in any way*, it necessarily meant that selling an asset and taking title in a name other than that of the trust's would not, by itself, take the property out of the trust. The whole point of section 5.06 is that title could be taken in the name of the trustors as distinct from the trust itself and the property would still be *in* the trust.

By the same token, the fact that after Barbara's death George simply ignored the 1985 trust he had entered into with Barbara could not take the Circle Haven proceeds out of the trust. After all, section 5.06 was obviously put in the trust so that it would be easy to ignore the existence of the trust and still maintain assets in it. But there is a price to be paid for such convenience. In computerese, section 5.06 made "remain in trust" the default setting. Some affirmative action *beyond merely a change in form of title* on the part of the trustors was required to click off that default.

■ Having determined that the placement of assets within the trust became irrevocable with Barbara's death in 1994, it follows that George and

---

[2] The provision for delivery to the trustee was probably a result of taking a more conventional trust and not editing it so as to adapt it for cases where the trustors are their own trustees—editing, as journalists say, "with a shovel." The provision, of course, has its comic aspect: George and Barbara could have made a modification of their trust by signing a memo to themselves, which would have been effective at the moment of signing, but George and Barbara would suffer no liability to themselves as trustees if they didn't deliver it to themselves! Delivery, for what it is worth, is not an issue in this case. The dispositive thing here is that there was nothing at all, delivered or undelivered, to indicate that by selling Circle Haven the proceeds were to be taken out of the trust.

Mary Ann's attempt to place those assets in another trust in 1996, and Mary Ann's subsequent attempt to further place those assets in yet a third trust in 2002, constituted conversion of the assets of the original trust. Conversion exists if there is substantial interference or "an exertion of wrongful dominion over the personal property of another in denial of or inconsistent with his rights therein." (*George v. Bekins Van & Storage Co.* (1949) 33 Cal.2d 834, 837 [205 P.2d 1037].)

## B. *There Was No Prejudicial Error Regarding the Statement of Decision*

The judge signed the statement of decision on October 2, 2003, which was less than 10 days after September 23, when the respondents submitted a proposed statement of decision. The trial judge clearly signed the statement of decision before the time to file objections had expired. (See Cal. Rules of Court, rule 232(e) ["Any party affected by the judgment may, within 10 days after service of the proposed judgment, serve and file objections thereto. [¶] The court shall, within 10 days after expiration of the time for filing objections to the proposed judgment . . . sign and file its judgment."].)

██ However, as this court recently noted in *In re Marriage of Steiner* (2004) 117 Cal.App.4th 519, 524–525 [11 Cal.Rptr.3d 671], the premature signing of a proposed statement of decision does not constitute *reversible* error unless actual prejudice is shown. Here, none is. The main purpose of an objection to a proposed statement of decision is not to reargue the merits, but to bring to the court's attention inconsistencies between the court's ruling and the document that is supposed to embody and explain that ruling. In fact, if objections do not present deficiencies to the trial court, "the appellate court will imply findings to support the judgment." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1134 [275 Cal.Rptr. 797, 800 P.2d 1227].)

As it turned out, Mary Ann did file objections, but those objections did not identify any inconsistencies with the intended decision. Her objections were 67 pages arguing that the evidence should be reweighed in her favor. Those objections went to the underlying *merits* of the proposed decision, not its *conformity* with what the trial court had previously announced.[3] Therefore, we conclude that the trial court's error was harmless.[4]

---

[3] Most of the objections are in the form of excerpts from the proposed statement of decision in bold, followed by text attacking the excerpt, usually as contrary to the evidence.

[4] We distinguish here between merits and procedure—the trial court's procedural error was harmless. If, indeed, there really was no evidence to support most of the statements in the statement of decision (as one would gather from the filed objections), Mary Ann was still perfectly free to point out that lack of evidence in this appeal from the merits of the judgment. That her arguments on appeal are essentially legal (e.g., that the trial court was required to

However, a subsidiary purpose for objections to a statement of decision is also to identify issues presented during the trial which are not addressed in the decision. Mary Ann claims that because the court did not address the issue of laches in the statement of decision, and therefore its absence is reversible error. The laches issue (the merits of which are addressed immediately below) was based on the theory that George and Barbara's son and son-in-law should have sued Mary Ann after Barbara's death in 1994, not after George's death in 2002. However, if issues are not presented in the pleadings, then no findings are necessary. (*Rossi v. Hackett* (1961) 190 Cal.App.2d 400, 406–407 [12 Cal.Rptr. 12].) In this case, Mary Ann did not assert the affirmative defense of laches in her pleadings; in fact, it was first mentioned in closing arguments. The trial court was therefore not required to issue findings on that particular issue.

### C.  *No Laches*

On the merits, Mary Ann's laches theory is that Frank and William should have begun this action after their mother died eight years earlier, even though their father was still living. But that idea doesn't fly, because Frank and William weren't informed of the fact that they had actually become trustees of the family trust on Barbara's death. Accordingly, they could justifiably assume that George, as surviving trustee, would deal fairly with the trust assets during the remainder of his life, so there would be no need to exercise their rights as regards the trust assets until his death. And, in fact, Frank and William began litigating within two months of George's death, which was hardly an unreasonable passage of time.

### D.  *Damages*

#### 1.  Value of the Trust

Mary Ann first contends that the trial court had no substantial evidence with which to determine the value of the 1985 trust at the time of Barbara's death. The argument is based on the idea that a schedule of assets created by Frank was inadmissible because it is partially based on nonadmitted evidence.[5] However, since the schedule was a general compilation of documents that could not be examined individually by the court without great loss of time, it was admissible. (See Evid. Code, § 1523, subd. (d) ["oral testimony

---

conclude that by taking title in joint tenancy, the proceeds of the Circle Haven property were necessarily taken out of the trust) is some indication that the main purpose of the objections was simply to take advantage of one last opportunity to reargue the evidence.

[5] Frank created exhibits 190 and 191, which the trial court admitted over appellant's objections because it "was a document created by the witness . . . from other exhibits that have already been admitted, so I will admit it over your objection, just for that purpose."

of the content of a writing is not made inadmissible . . . if the writing consists of numerous accounts or other writings that cannot be examined in court without great loss of time, and the evidence sought from them is only the general result of the whole"].)

## 2. Distributions

We have already discussed the anomaly that, under the literal terms of the trust, George and Mary Ann had to write a memo to themselves (or its substantive equivalent) to amend the trust. Mary Ann also argues that she should be credited with moneys that George *would* have been entitled to if he had "forced" the trustees to give it to him. She notes that this would include all the income from both trusts. Moreover, she says that George could have revoked his one-half interest in the trust, and could also (though this would be more speculative) have exercised his annual right to invade 5 percent or $5,000 of principal.

This whole line of argument fails because George, for some reason— perhaps because he thought that by ignoring it it would go away—never acknowledged the existence of the 1985 trust to anyone, even himself. Mary Ann's argument thus has an if-pigs-had-wings quality. It is essentially circular: If George had exercised his rights he would have had the right to the money, ergo he should have the right to the money. The argument fails because there is no authority within the four corners of the trust by which a court should be compelled to *impute* the exercise of rights within the framework of the trust to someone who was intent on ignoring the trust altogether.

Of course, if you step back and look at the record in broader terms, George's inertness makes a certain kind of sense: One can reasonably infer that George did not want to acknowledge to Mary Ann that assets she thought *were his* were really tied up in an earlier trust made for the benefit of the children of first wife. For George to have formally revoked his one-half interest in the trust,[6] or formally requested the 5 percent principal distributions or general income distributions, would have been to acknowledge that those assets weren't really his.

---

[6] We express no opinion as to whether such a revocation would have been effective even if it had been attempted.

Lastly, Mary Ann argues that the trial court failed to recognize her own contributions to the trust (i.e., the 1996 trust) in its award. But Mary Ann certainly would not have contributed to the 1985 trust prior to Barbara's death in 1994, when the trust became irrevocable. Since the award is based on the trust's value at that time, Mary Ann's contributions to the 1996 trust are irrelevant.

## V.   DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

Aronson, J., and Ikola, J., concurred.

A petition for a rehearing was denied December 15, 2004, and appellant's petition for review by the Supreme Court was denied February 2, 2005. Kennard, J., was of the opinion that the petition should be granted.