Filed 10/25/17

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| YDM MANAGEMENT CO., INC.,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>SHARP COMMUNITY MEDICAL GROUP, INC.,<br><br>    Defendant and Respondent. | D071244<br><br><br><br>(Super. Ct. No. 37-2014-00042397-CU-CO-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County,

Joel M. Pressman, Judge.  (Retired judge of the San Diego Sup. Ct.)  Affirmed.

Levene, Neale, Bender, Yoo & Brill, Daniel H. Reiss and Kurt E. Ramlo for

Plaintiff and Appellant.

Duckor Spradling Metzger & Wynne, Anna F. Roppo and Robert M. Shaughnessy

for Defendant and Respondent.

INTRODUCTION

Plaintiff YDM Management Company, Inc. (YDM) appeals from a judgment of the trial court in favor of defendant Sharp Community Medical Group, Inc. (Sharp), after Sharp successfully moved for summary judgment of YDM's operative complaint.

YDM, a San Diego company that purchases accounts receivable from physicians and health care providers, purchased accounts receivable from Doctors Express, a company that operates urgent care facilities in San Diego, for services rendered to Sharp managed care members. Sharp is an Independent Practice Association (IPA), which is an association of physicians that contracts to provide medical care to members. (See *Inland Empire Health Plan v. Superior Court* (2003) 108 Cal.App.4th 588, 590 ["[A]n IPA is an association of physicians that contracts to provide medical care to HMO members in the physicians' own offices. The IPA in turn contracts with each of its independent practitioner members regarding the terms of participation in the IPA, including payment."]; see also *Heritage Provider Network, Inc. v. Superior Court* (2008) 158 Cal.App.4th 1146, 1149, fn. 2 ["IPA's contract with health maintenance organizations (HMO's) to provide medical care to HMO members. The IPA's, which provide administrative services such as the credentialing of physicians and eligibility verifications of the HMOs' members, then contract with medical professionals to treat members. The medical professionals are typically deemed independent contractors responsible for their own separate medical practices"].) In its role as an IPA, Sharp provides health care

insurance to its managed care members, and pays claims for health care services that are provided to its members.

At the time that it provided the services at issue to Sharp members, Doctors Express did not have a preferred provider contract with Sharp. Providers without a contract with an IPA are reimbursed for *nonemergency* medical services provided to the IPA's members at amounts that tend to be significantly less than the "reasonable and customary value for the health care services rendered." (Cal. Code Regs., tit. 28, § 1300.71, subds. (a)(3)(B), (a)(3)(C).) However, an IPA such as Sharp is required by regulation to reimburse out of network providers for the full "reasonable and customary value" for any *emergency* medical services provided to its members. (*Ibid.*)

As the assignee of Doctors Express, YDM filed this lawsuit seeking additional reimbursement from Sharp for services provided by Doctors Express to members of Sharp's health plan, beyond the amount that Sharp had already reimbursed Doctors Express for those services. YDM has alleged that Doctors Express provided *emergency medical services* to Sharp members at its Doctors Express locations, and, as a result, pursuant to California regulations, Doctors Express (and now its assignee YDM) is entitled to receive reimbursement for these services at Doctors Express's "usual, customary, and reasonable rates."

Sharp moved for summary judgment, and presented evidence that the billing claims that Doctors Express submitted to Sharp for reimbursement for services did not

3

include Current Procedural Technology codes (or CPT codes)[1] that would have identified those services as emergency services. Sharp maintained that YDM could therefore not establish that Doctors Express had provided "emergency medical services" to Sharp managed care members. The trial court granted summary judgment in favor of Sharp. On appeal, YDM contends that the trial court erred in granting summary judgment in Sharp's favor based on the declaration of a Sharp employee, and that the court erred in failing to give adequate consideration to the declaration of YDM's expert in concluding that there was no triable issue of material fact.

We conclude that the trial court did not err in granting summary judgment in favor of Sharp. We therefore affirm the judgment.

II.

FACTUAL AND PROCEDURAL BACKGROUND

Sharp contracts with independent medical providers for those providers to furnish Sharp's members with health care services at negotiated rates. Sharp pays claims for health care services that are provided to its members by both contracted, as well as noncontracted providers.

---

1      "Current Procedural Technology . . . Codes" or "CPT codes" are published annually by the American Medical Association and comprise a comprehensive list of medical, surgical, and diagnostic services that is widely used in the healthcare industry. (*People ex rel. Allstate Insurance Co. v. Muhyeldin* (2003) 112 Cal.App.4th 604, 607 (*Allstate Insurance*).) By using particular codes in bills to insurance companies or patients, a medical services provider represents that he/she/it has rendered the type of services described by the codes used.

4

Pursuant to an assignment agreement, YDM purchased the accounts receivable of Doctors Express, "an 'out-of-network' [medical services] provider that had no preferred provider contract with [Sharp] at the time all of the services [at issue in this case] were provided." The parties do not dispute that Doctors Express operates urgent care facilities in the San Diego area. YDM does not provide medical services itself.

YDM filed this action against Sharp, asserting causes of action for breach of implied contract, recovery of payment for services rendered, recovery on an open book account, and quantum meruit, alleging that Doctors Express had provided "emergency medical services" to a number of Sharp's managed care patients.

It is undisputed that Doctors Express did provide medical services to Sharp members, and that prior to the assignment of its claims to YDM, Doctors Express had billed Sharp for the services that it had provided to Sharp's members. It is also undisputed that Doctors Express submitted its claims for reimbursement to Sharp by utilizing CPT codes.

YDM further alleged that California law required Sharp to compensate YDM for those "emergency medical services" at the "usual, customary, and reasonable rates" charged by Doctors Express for providing such services. According to YDM's complaint, Sharp was "obligated to pay non-contracted providers such as [Doctors Express]," and the "regulations provide a methodology for determining the rate to be paid to out-of-network emergency room providers." YDM alleged that Sharp failed to reimburse Doctors Express at its "customary, or usual" rates, as required by the

5

regulations, and instead reimbursed the claims "at below usual, customary, and reasonable levels."

Sharp moved for summary judgment, arguing that Doctors Express operates urgent care facilities, not emergency departments, and that only emergency departments at hospitals that are licensed as such can provide " 'emergency medical services' " for which insurers are obligated to reimburse providers at their " 'usual, customary, and reasonable rates.' " Sharp submitted the declaration of Carol Wanke, Sharp's vice-president of Post-Acute Patient Financial Services and Managed Care Operations, in support of its motion for summary judgment. Wanke attested to her knowledge of the "process by which a non-contracted health care provider submits a claim to [Sharp] for payment for medical services rendered to [a Sharp] member or enrollee of a managed care health plan," and further stated that providers follow "standard billing procedures that are set forth by the American Medical Association" which "require the use of Current Procedural Terminology ('CPT') codes and other codes that identify, among other things, the type of services provided, and where the services are provided." Wanke also stated that "[e]mergency services are coded using the following CPT codes: 99281, 99282, 99283, 99284, and 99285." According to Wanke's declaration, she searched Sharp's records to find information regarding the claims that Doctors Express submitted to Sharp for reimbursement for services provided between January 1, 2012 and December 31, 2014. Wanke caused a spreadsheet to be prepared that identified each claim for payment and includes the place of service code for each claim, as well as the CPT code indicating

6

the type of medical services provided. Wanke declared that "[n]one of the CPT codes identify the services provided as emergency services."

In response to Sharp's motion for summary judgment, YDM submitted the declaration of Dr. Jonathan Nissanoff, M.D., a board certified orthopedic surgeon and President of YDM. Nissanoff attested that he is familiar with "the nature and use and definitions of Current Procedural Terminology (CPT) codes and code sets maintained by the American Medical Association." He explained that "CPT codes are universally used for billing purposes to communicate to the obligor for payment . . . the specific nature of the services provided," and that, specifically, "[t]hese CPT codes communicate, among other things, information that enables the recipient to identify from the CPT [c]odes whether emergency services were provided to the patient." According to Nissanoff, "urgent care centers often furnish emergency services to patients because the patients will often present to and seek immediate treatment from an urgent care center on an unscheduled, non-elective basis without fully appreciating whether their condition involves the need for emergency services." Nissanoff further attested that he "reviewed all of the claims assigned to Plaintiff which are the subject of this action and [had] knowledge of their contents, including the CPT [c]odes assigned for the services charged to the patients by the health care providers which disclose the nature of the services provided to the patients for which services w[ere] rendered." Nissanoff stated that "it is [his] opinion to a reasonable probability that all of those services which have been assigned to YDM involved the provision of emergency services to patients by the assignees."

7

The parties each made multiple evidentiary objections to the other's supporting declaration.

The trial court heard argument from counsel on August 19, 2016. The trial court overruled virtually all of both parties' evidentiary objections, with two exceptions of particular relevance to this case, the court sustained Sharp's objection to paragraph 16 of Nissanoff's declaration, which is the paragraph in which Nissanoff expressed his opinion that "all of those services which have been assigned to YDM involved the provision of emergency services to patients by the assignees."

The trial court granted Sharp's motion for summary judgment. The court concluded:

> "While it is conceivable that an urgent care center could provide 'emergency services', the evidence in this case indicates that none of the billings [are] coded 'emergency services.' Ms. Wanke's declaration indicates that none of the claims presented by the urgent care center involved emergency services. She specifically identifies codes used for emergency care services and states that none of them are included in the billings. [Citation.] [¶] . . . [¶] Plaintiff offers no admissible evidence to counter Ms. Wanke's declaration that Doctors Express did not bill for emergency services. Jonathan Nissanoff's Declaration that 'all of the services which have been assigned to YDM involved the provision of emergency services to patients . . . ' [citation] is without foundation."

The trial court entered judgment in favor of Sharp on August 30, 2016. YDM filed a timely notice of appeal.

8

III.

DISCUSSION

Pursuant to regulation, medical service providers who contract with a health care services plan are entitled to reimbursement at the contracted rate for those services provided to members of the plan who are covered by the contract. (Cal. Code Regs., tit. 28, § 1300.71, subd. (a)(3)(A).) Medical service providers who provide services to members of a health care services plan but do not have a written contract with the health care services plan for the services at issue are entitled to reimbursement for the "reasonable and customary value for the health care services rendered" only for "emergency services." (Cal. Code Regs., tit. 28, § 1300.71, subds. (a)(3)(B).) For nonemergency services, such medical service providers are entitled to reimbursement from the plan, but only for "the amount set forth in the enrollee's Evidence of Coverage." (*Id.*, subd. (a)(3)(C).) Often, there is a difference between the "amount set forth in the enrollee's Evidence of Coverage" and the amount billed by a medical provider; the amount billed is almost invariably more than the amount set forth in the plan. Medical providers who provide "non-emergency services" in the absence of a contract covering those services often attempt to obtain the difference between "the amount set forth in the enrollee's Evidence of Coverage" and their "reasonable and customary" (Cal. Code Regs., title 28, § 1200.71, subds. (a)(3)(B), (a)(3)(C)) rates by billing the individual patients directly, a practice referred to as "balance billing." (See *Prospect Medical Group, Inc. v. Northridge Emergency Medical Group* (2009) 45 Cal.4th 497, 502 (*Prospect Medical*) [when a health care services plan reimburses a provider at a rate lower than the amount

9

billed, practice of billing the patient for the difference between the bill submitted and the payment received is " 'balance billing' "].)[2]

The parties disagree as to whether Sharp is obligated, pursuant to California regulations, to reimburse YDM, as Doctors Express's assignee, at the usual, customary, and reasonable rates for emergency medical services for the services that Doctors Express provided to Sharp members. The parties agree that insurers are obligated to reimburse noncontracted providers for emergency medical services provided to their insureds at that provider's "reasonable and customary" rates. (See Cal. Code Regs., tit. 28, § 1300.71, subd. (a)(3)(B).) The parties disagree, however, as to whether an urgent care facility can ever be entitled to reimbursement from a patient's insurer for the "reasonable and customary value" (*ibid.*) of emergency services.

Sharp contends that urgent care centers are not licensed hospital emergency departments, and that they therefore cannot, as a matter of law, bill health care service plans for emergency services provided to the plan's members. Sharp argues that the law imposes an obligation on health care service plans to reimburse only emergency departments for any emergency services provided because the law imposes a duty on emergency departments—but not on urgent care centers—to provide emergency care to anyone, regardless of ability to pay. Sharp further contends that Doctors Express failed

_____

[2]     The Supreme Court has concluded, however, that providers of emergency services may not " 'balance bill[ ]' " patients for emergency services, since emergency services providers are entitled to obtain their " 'reasonable and customary' " rates from health care service plans directly. *(Prospect Medical*, *supra*, 45 Cal.4th at pp. 502, 505, 507–509.)

10

to designate any of the services provided to Sharp's members as "emergency services" through the CPT codes used in the claims that it submitted for payment to Sharp.

YDM, standing in the shoes of Doctors Express,[3] argues that there is no provision of law that limits "emergency services" to those services provided in an emergency department of a hospital. Rather, YDM asserts, whether a provider has provided "emergency services" to a patient depends on "the condition of the patient, not on where the services were sought or rendered."

1. *Summary judgment standards*

"Summary judgment and summary adjudication provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute. [Citations.] A defendant moving for summary judgment or summary adjudication may demonstrate that the plaintiff's cause of action has no merit by showing that (1) one or more elements of the cause of action cannot be established, or (2) there is a complete defense to that cause of action." (*Collin v. CalPortland Co.* (2014) 228 Cal.App.4th 582, 587 (*Collin*).)

Generally, "the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of

_____

3      Through the assignment agreement, YDM stands in the shoes of Doctors Express. As the assignee of Doctors Express, YDM may bring all of the claims that Doctors Express could have brought, and is subject to all of the defenses that Sharp could have raised against Doctors Express if Doctors Express had filed this action. (*Searles Valley Mineral Operations, Inc. v. Ralph M. Parsons Service Co.* (2011) 191 Cal.App.4th 1394, 1402.)

11

material fact; if [that party] carries [t]his burden of production, [the moving party] causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 850 (*Aguilar*).)  In moving for summary judgment, "all that the defendant need do is to show that the plaintiff cannot establish at least one element of the cause of action—for example, that the plaintiff cannot prove element *X*." (*Id.* at p. 853.)  "A defendant moving for summary judgment or summary adjudication need not conclusively negate an element of the plaintiff's cause of action. [Citations.]  Instead, the defendant may show through factually devoid discovery responses that the plaintiff does not possess and cannot reasonably obtain needed evidence." (*Collin*, *supra*, 228 Cal.App.4th at p. 587.)

"After the defendant meets its threshold burden [to demonstrate that a cause of action has no merit], the burden shifts to the plaintiff to present evidence showing that a triable issue of one or more material facts exists as to that cause of action or affirmative defense. [Citations.]  The plaintiff may not simply rely on the allegations of its pleadings but, instead, must set forth the specific facts showing the existence of a triable issue of material fact. [Citation.]  A triable issue of material fact exists if, and only if, the evidence reasonably permits the trier of fact to find the contested fact in favor of the plaintiff in accordance with the applicable standard of proof." (*Collin*, *supra*, 228 Cal.App.4th at p. 588.)

"On appeal, the reviewing court makes ' "an independent assessment of the correctness of the trial court's ruling [regarding summary judgment], applying the same

12

legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law." ' " (*Hesperia Citizens for Responsible Development v. City of Hesperia* (2007) 151 Cal.App.4th 653, 658.)  Our task is to determine whether a triable issue of material fact exists.  (*Collin*, *supra*, 228 Cal.App.4th at p. 588.)  In independently examining the record on appeal "to determine whether triable issues of material fact exist," we " 'consider[ ] all the evidence set forth in the moving and opposition papers except that to which objections were made and sustained.' "  (*Ambriz v. Kelegian* (2007) 146 Cal.App.4th 1519, 1530.)

2.  *Relevant statutory and regulatory background regarding the provision of, and reimbursement for, emergency services*

Under state and federal law, emergency services and care "*shall be provided* to any person requesting the services or care" by any licensed health facility that has appropriate facilities and qualified personnel.  (Health & Saf. Code, § 1317, subd. (a), italics added; see 42 U.S.C. § 1395dd(b).)[4]  Emergency services and care are to be provided without regard to the patient's "insurance status, economic status [or] ability to

---

[4]     Section 1250 of the Health and Safety Code defines a "health facility" as "a facility, place, or building that is organized, maintained, and operated for the diagnosis, care, prevention, and treatment of human illness, physical or mental, including convalescence and rehabilitation and including care during and after pregnancy, or for any one or more of these purposes, for one or more persons, *to which the persons are admitted for a 24-hour stay or longer*" (italics added), including general care hospitals, psychiatric hospitals, skilled nursing facilities, intermediate care facilities, nursing facilities and hospice facilities.  Health and Safety Code section 1250 does not include a reference to "urgent care" clinics or facilities.

13

pay." (Health & Saf. Code, § 1317, subd. (b).) In fact, emergency services and care must be provided without a provider first questioning the patient as to insurance or ability to pay. (Health & Saf. Code, § 1317, subd. (d); 42 U.S.C. § 1395dd(h).) Further, a health facility generally may not transfer or discharge a patient until it has been determined that the patient's emergency medical condition has been stabilized. (Health & Saf. Code, §§ 1317.1, subd. (j), 1317.2; 42 U.S.C § 1395dd(c), (e)(3).)

The Health and Safety Code defines "emergency services and care," for purposes of when a licensed health facility must provide such care. Section 1317.1 of the Health and Safety Code provides in relevant part:

> "Unless the context otherwise requires, the following definitions shall control the construction of this article and Section 1371.4:
>
> "(a)
>
> "(1) 'Emergency services and care' means medical screening, examination, and evaluation by a physician and surgeon, or, to the extent permitted by applicable law, by other appropriate licensed persons under the supervision of a physician and surgeon, to determine if an emergency medical condition or active labor exists and, if it does, the care, treatment, and surgery, if within the scope of that person's license, necessary to relieve or eliminate the emergency medical condition, within the capability of the facility.
>
> "[¶] . . . [¶]
>
> "(b) 'Emergency medical condition' means a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in any of the following:
>
> "(1) Placing the patient's health in serious jeopardy.

14

"(2) Serious impairment to bodily functions.

"(3) Serious dysfunction of any bodily organ or part.

"(j) A patient is 'stabilized' or 'stabilization' has occurred when, in the opinion of the treating physician and surgeon, or other appropriate licensed persons acting within their scope of licensure under the supervision of a treating physician and surgeon, the patient's medical condition is such that, within reasonable medical probability, no material deterioration of the patient's condition is likely to result from, or occur during, the release or transfer of the patient as provided for in Section 1317.2, Section 1317.2a, or other pertinent statute."

The Knox-Keene Health Care Service Plan Act of 1975 (Knox-Keene Act), a comprehensive system of licensing and regulation, governs health care service plans such as Sharp's. (See Health & Saf. Code, § 1340 et seq.; *Prospect*, *supra*, 45 Cal.4th at p. 504.) The intent and purpose of the Legislature in enacting the Knox-Keene Act was "to promote the delivery and the quality of health and medical care to the people of the State of California who enroll in, or subscribe for the services rendered by, a health care service plan or specialized health care service plan." (Health & Saf. Code, § 1342.)

Given that the law elsewhere requires that emergency services and care be provided without regard to a patient's insurance or ability to pay, the Knox-Keene Act imposes a requirement that health care service plans must reimburse a provider who has provided emergency services or care to a health care service plan's enrollee. (Health & Saf. Code, § 1371.4, subd. (b).) The Department of Managed Health Care (the Department) has promulgated regulations concerning the reimbursement of claims for emergency and nonemergency services. (See *Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260, 1271 (*Children's Hospital*).)

15

Specifically, section 1300.71 of title 28 of the California Code of Regulations is entitled "Claims Settlement Practices," and is authorized by Health and Safety Code sections 1371 and 1371.35, which impose procedural requirements on claim processing and subject health care service plans to disciplinary action and penalties for failure to timely comply with those requirements. (*California Medical Assn. v. Aetna U.S. Healthcare of California, Inc.* (2001) 94 Cal.App.4th 151, 163.)

Most relevant to the matters raised here, pursuant to section 1300.71 of title 28 of the California Code of Regulations, a health service plan *must* reimburse a noncontracted provider for "the reasonable and customary value" of emergency services provided to the plan's enrollee. (Cal. Code Regs., tit. 28, § 1300.71, subd. (a)(3)(B).)[5]

---

5    California Code of Regulations, title 28, section 1300.71(a)(3) (hereafter Section 1300.71(a)(3)) defines the phrase "reimbursement of a claim" in the following manner:

> "(A) For contracted providers with a written contract, including in-network point-of-service (POS) and preferred provider organizations (PPO): the agreed upon contract rate;

> "(B) For contracted providers without a written contract and non-contracted providers, except those providing services described in paragraph (C) below: the payment of the reasonable and customary value for the health care services rendered based upon statistically credible information that is updated at least annually and takes into consideration: (i) the provider's training, qualifications, and length of time in practice; (ii) the nature of the services provided; (iii) the fees usually charged by the provider; (iv) prevailing provider rates charged in the general geographic area in which the services were rendered; (v) other aspects of the economics of the medical provider's practice that are relevant; and (vi) any unusual circumstances in the case; and

16

3. *Analysis*

We begin by noting, as the trial court did, that we have found nothing in statute or regulation that states that only facilities that are specially licensed to operate an emergency department may provide "emergency services." However, Sharp contends that Doctors Express could not seek payment for the reasonable and customary value of any emergency services that it alleges it provided to Sharp members "because Doctors Express cannot provide emergency medical services at urgent care centers as a matter of law."[6] In making this argument, Sharp relies on the Code of Federal Regulations, which provides the following definition of "emergency services" for use in administering

---

"(C) For non-emergency services provided by non-contracted providers to PPO and POS enrollees: the amount set forth in the enrollee's Evidence of Coverage."

By excluding "non-emergency services provided by non-contracted providers" in subdivision (a)(3)(C) from the provisions of subdivision (a)(3)(B), section 1300.71(a)(3) renders subdivision (a)(3)(B) the provision governing the rate at which providers without a governing contract with the patient's health care service plan are to be reimbursed for their provision of *emergency services* to a plan's member.

[6] We do not understand Sharp to be contending that urgent care centers may not, or should not, treat an individual who presents with an emergency condition requiring immediate attention. Rather, we interpret Sharp's position to be that only licensed emergency departments may be considered to have rendered "emergency services" for which health care services plans are obligated to reimburse at the reasonable and customary value for those services, pursuant to California law. According to Sharp, because urgent care centers are not *required* by law to provide such services to any person who walks through their doors and are not specially licensed to provide those services—unlike hospitals with emergency departments that are required to provide those services and are licensed to do so—urgent care centers are not entitled to be reimbursed by a patient's insurer or health service plan for the "reasonable and customary value" of those services. Instead, according to Sharp, urgent care centers are limited to recovering from the patient, through balance billing, the difference between the amount that the patient's insurer reimburses a noncontracted provider and the "reasonable and customary value" of the service provided by an urgent care center.

17

Medicare: "Emergency services means inpatient or outpatient *hospital* services that are necessary to prevent death or serious impairment of health and, because of the danger to life or health, require use of the most accessible *hospital* available and equipped to furnish those services." (42 C.F.R. § 424.101, italics added.) However, it is not clear that the federal definition of "emergency services" is necessarily the standard applicable with respect to California's Knox-Keene Act requirements for reimbursement of providers for medical services provided to health care service plan members, and Sharp provides no authority to support adopting this standard. Nor does Sharp discuss how this standard should or would interact with the definition of "emergency services and care" that is set forth in the Health and Safety Code.

Sharp also makes a public policy argument that only hospitals or other licensed health facilities with emergency departments should be able to obtain reimbursement from health care service plans for the "reasonable and customary value" (Cal. Code. Regs., tit. 28, § 1300.71(a)(3)(B)) of emergency services provided to plan members because only hospitals and licensed health facility with emergency departments are *obligated by statute* to provide emergency services to all patients, regardless of any individual's ability to pay. (See *Children's Hospital*, *supra*, 226 Cal.App.4th at p. 1266.) Sharp argues that the managed care system would be "turned on its head" if noncontracted urgent care centers are permitted to obtain reimbursement from a health care service plan for the reasonable and customary value of their services by "mischaracterizing urgent care services as 'emergent' " because there would be no incentive to patients to seek in-network treatment with the plan's contracted urgent care

18

centers or primary care physicians. Sharp raises a dire alarm that the troubling effects from what YDM proposes in this case would "destroy the managed care system."[7]

We need not determine whether the only providers who may be reimbursed for "emergency services" are those who provided services within a licensed emergency department in a licensed health facility. Rather, we reach a more narrow holding based on the record presented to us on appeal. As we explain further, even if one presumes that it is possible that an urgent care center or medical provider other than a hospital's emergency department can be considered to have provided "emergency services and care" as that phrase is defined under California law, and would therefore be entitled to reimbursement from a health care service plan for the "reasonable and customary value" of such services, *in this case* Sharp has presented undisputed evidence that Doctors Express submitted no claims to Sharp indicating that it provided emergency services to Sharp members. Instead, according to the evidence presented by Sharp, the codes utilized in the billings that Doctors Express submitted to Sharp indicate that Doctors Express provided only "non-emergency services." YDM's evidence, in the form of an expert declaration, failed to adequately place this issue in dispute. Therefore, the

---

7       Sharp notes that the loss of the incentive to plan members to seek in-network care "would have a chilling effect on contracts between health plans and IPAs on the one hand, and physicians on the other," because the medical providers would no longer receive the benefit of access to a large group of members with an incentive to seek treatment with those particular providers. Sharp also raises the concern that health plans and IPAs such as Sharp would "face the burden of reimbursing unlicensed non-contracted urgent care centers for so-called 'emergency' services at rates higher than contracted physicians," and that "[o]ver time those higher health care costs would be reflected in higher premiums, and higher co-pays" for members.

evidence in the record demonstrates that Doctors Express billed only for "non-emergency services," which means that Doctors Express essentially admitted that it did not provide "emergency services" to those Sharp members who sought treatment at a Doctors Express facility and as to whom it submitted the claims at issue in this case.

   a.  *Sharp's evidence presented in support of its motion for summary judgment was sufficient to make a prima facie showing of the nonexistence of any triable issue of material fact*

      i.  *The Wanke declaration is evidence that Doctors Express did not bill for providing "emergency services"*

The parties agree that medical providers use CPT codes to describe and communicate the nature of the medical services that have been provided to a patient. CPT codes "were jointly developed by the American Medical Association and the Health Care Financing Administration and are the standardized nomenclature for use in insurance claims."  (*Allstate Insurance*, *supra*, 112 Cal.App.4th at p. 607.)  Plaintiff's expert Nissanoff concedes in his declaration that "[t]he type of service identified by the CPT code allows the recipient to ascertain the nature of the services provided . . . ."  He further concedes that "based on the services described in a CPT code, it can be determined what services were furnished . . . ."

Sharp presented evidence, in the form of Wanke's declaration, that the claims that Doctors Express submitted to Sharp included no billing codes for "emergency services." Wanke states in her declaration that "[e]mergency services are coded using the following CPT codes:  99281, 99282, 99283, 99284, and 99285."  She further declares, "None of the CPT codes [found in Sharp's records of claims made by Doctors Express] identify the

services provided as emergency services."[8]  The evidence presented by Sharp demonstrates that Doctors Express did not bill Sharp by using the emergency services CPT codes of 99281, 99282, 99283, 99284, or 99285, and, therefore, that Doctors Express did not utilize the CPT billing codes that would indicate to Sharp that the providers at Doctors Express had provided "emergency services" to Sharp members.

Doctors Express's claims for payment are concessions about the nature of the services that were provided—i.e., by not using CPT codes that would signify that it had provided "emergency services" in the billings it submitted to Sharp, Doctors Express conceded that it had not provided "emergency services" to Sharp's members.  Because Doctors Express's assignee, YDM stands in its shoes, YDM, is bound by Doctors Express's concessions as to the nature of the services it provided to Sharp's members.  YDM may not now assert that the services provided were different from what Doctors Express communicated to Sharp through its billing claims.

> ii.  *YDM's evidentiary challenges to the Wanke declaration are without merit*

On appeal, YDM challenges the trial court's reliance on Wanke's declaration.  In the trial court, YDM objected to Wanke's declaration, arguing that it constituted multiple hearsay and lacked foundation, and arguing that Wanke lacked personal knowledge about the billings.  YDM relies on *Garibay v. Hemmat* (2008) 161 Cal.App.4th 735, 742

---

[8]     Wanke further attests that rather than using the codes that indicate that "emergency services" were rendered, "standard evaluation and management CPT codes [were] used, similar to the types of CPT codes one would expect to see in an outpatient environment or from a medical office."

21

(*Garibay*), arguing that because Wanke did not supply the "verbatim substance of out-of-court records of which [she] has no personal knowledge," and failed to establish a proper foundation for the admissibility of those records, the trial court should not have admitted or considered Wanke's declaration. According to YDM, Wanke offered an expert opinion, based "solely on her recitation in a spreadsheet . . . of the verbatim contents of the assigned out-of-court hearsay claims involve[d] in this case, allegedly setting forth the CPT Codes for such services, which she offers for the truth of the matter asserted (i.e., none of these CPT codes are for emergency services)."

We reject YDM's characterization of Wanke's declaration and further reject its reliance on *Garibay* to attempt to undermine the admissibility of the declaration. In *Garibay*, a defendant doctor offered the declaration of her medical expert in support of her motion for summary judgment. The plaintiff had sued the defendant, alleging that the doctor failed to properly perform a tubal ligation, which had led to an unwanted pregnancy. (*Garibay*, *supra*, 161 Cal.App.4th at p. 742.) The defendant's medical expert stated that he had reviewed the relevant medical records regarding the care the defendant had provided to the plaintiff. (*Id.* at p. 739.) However, the defendant did not offer the records of the procedure or her own deposition testimony regarding the procedure. Rather, the only evidence set forth on summary judgment by the defendant was the expert doctor's declaration, which summarized the details of the procedure based on records that were not supplied to the court. The *Garibay* court concluded: "Without those hospital records, and without testimony providing for authentication of such records, Dr. Frumovitz's declaration had no evidentiary basis. Consequently his expert medical

22

opinion on whether defendant Hemmat met the standard of care had no evidentiary value." (*Id.* at p. 742.) The court explained: " '[A] witness's on-the-record recitation of sources relied on for an expert opinion does not transform inadmissible matter into "independent proof" of any fact.' [Citation.] 'Although experts may properly rely on hearsay in forming their opinions, they may not relate the out-of-court statements of another as independent proof of the fact.' [Citation.] Physicians can testify as to the basis of their opinion, but this is not intended to be a channel by which testifying physicians can place the opinion of out-of-court physicians before the trier of fact. [Citation.] Through his declaration, Dr. Frumovitz attempted to testify to the truth of the facts stated in the declaration for an improper hearsay purpose, as independent proof of the facts. [¶] Dr. Frumovitz had no personal knowledge of the underlying facts of the case, and attempted to testify to facts derived from medical and hospital records which were not properly before the court." (*Id.* at p. 743.)

*Garibay* involved claims of professional malpractice, and expert opinion was therefore necessary to prove or disprove whether the defendant had met the requisite standard of care. (See *Garibay*, *supra*, 161 Cal.App.4th at p. 741.) This case, however, is not a medical malpractice case, and Wanke's declaration was not offered to provide medical expert opinion to prove or disprove that Doctors Express met a particular standard of care. Rather, Wanke's declaration was offered to establish that Doctors Express had submitted claims to Sharp seeking payment for services that it had rendered, and to establish that Doctors Express had not utilized any CPT codes that would indicate that it had provided emergency services. Wanke offered testimony, through her

23

declaration, regarding her knowledge of the CPT codes that Doctors Express had submitted to Sharp for the claims at issue in this case.

In addition, Wanke laid a foundation for her testimony, and described her personal knowledge of the claims that Doctors Express submitted to Sharp for payment. Wanke attested that she is Sharp's vice-president for "Post-Acute Financial Services and Managed Care Operations," that she has been employed in a variety of positions with Sharp since 1991, and that she is familiar with the process by which noncontracted health care providers submit claims to Sharp for payment, as well as the policies and procedures of the Department of Managed Healthcare regarding the reimbursement of noncontracted health care providers. Wanke further attested to her familiarity with standard medical billing practices, including the use of CPT codes in billing. Wanke is familiar with the services described by CPT codes, and is knowledgeable about the codes used for emergency services. She also is familiar with place of services codes, which indicate the type of facility at which services were provided.

Wanke also attested to how she performed a search of Sharp's records to find information relevant to the claims that Doctors Express submitted to Sharp for payment that are at issue in this case. Wanke caused a spreadsheet to be prepared that included each claim for payment that Doctors Express submitted to Sharp for services provided between January 1, 2012 and December 31, 2014.

The spreadsheet included a column for the CPT codes submitted by Doctors Express to Sharp for services provided to Sharp members. Wanke attested that she

24

reviewed these CPT codes and that none of the CPT codes used were the CPT codes for emergency services.

Wanke's review of the CPT codes submitted to Sharp by Doctors Express, and her reliance on those CPT codes to conclude that none of them were CPT codes used to identify emergency services, was not based on inadmissible hearsay, as YDM contends. First, Wanke was not asserting that Doctors Express actually *performed* the services identified by those codes. Rather, she was asserting that Doctors Express submitted these specific numeric and alphanumeric codes in its claims for reimbursement, and that the codes are used to indicate to Sharp the nature of the services provided and for which payment is being sought. Second, even if Wanke were relying on the CPT codes submitted by Doctors Express for their truth, evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he or she is a party. (Evid. Code, § 1220.) Because YDM, as the assignee of Doctors Express, stands in Doctors Express's shoes, any statements made by Doctors Express are admissible against YDM as statements of a party. (See *Riedy v. Bidwell* (1928) 93 Cal.App. 202, 207 [statements made by assignor are admissible in a suit by the assignee on an assigned claim].) At a minimum, it would be unfair to permit YDM to exclude the "statements" of its assignor (i.e., the CPT codes included in the claims Doctors Express submitted to Sharp) as hearsay, given that YDM relies on those same claims to support its

25

contention that it is entitled to additional reimbursement for the provision of services to the patients for whom those claims were submitted.[9]

Further, to the extent that YDM attempts to challenge the trial court's admission of the spreadsheets that Wanke caused to be created because they are a summary of the claims submitted by Doctors Express, and are not the "underlying hearsay claims," we reject that challenge. Sharp offered the spreadsheets as secondary evidence, pursuant to Evidence Code section 1521, which provides in relevant part: " (a) The content of a writing may be proved by otherwise admissible secondary evidence. The court shall exclude secondary evidence of the content of writing if the court determines either of the following: [¶] (1) A genuine dispute exists concerning material terms of the writing and justice requires the exclusion. [¶] (2) Admission of the secondary evidence would be unfair."[10] As we have already explained, the statements made by Doctors Express in the form of CPT codes submitted in billing claims to Sharp are not inadmissible hearsay but rather, are admissible statements of a party. The trial court therefore did not err in

---

[9]     Indeed, YDM's expert also relies on the "claims assigned to Plaintiff which are the subject of this action" in attesting to certain facts in his declaration.

[10]     YDM has not raised any issue as to whether Wanke's summary is accurate or fails to adequately represent the material terms of the original claims submissions. Nor has YDM set forth any argument that admission of the summary spreadsheet is unfair. Although YDM suggests that the use of the spreadsheet "had the effect of denying Plaintiff any fair ability to cross-examine that critically missing foundational multiple hearsay evidence," this contention appears to be disingenuous. YDM clearly has access to the original claims submissions made by Doctors Express; its own expert, Nissanoff, attests that he "review[ed] [all] of the claims assigned to Plaintiff which are the subject of this action."

26

admitting the spreadsheet summary of the relevant information set forth in the reimbursement claims that Doctors Express submitted to Sharp.[11]

YDM also attempts to avoid the effect of Wanke's declaration by arguing in its reply brief that "the CPT 'place of service' codes and those codes designated for locations other than emergency departments would not indicate that the services were rendered in an emergency department, because they were not. . . . Thus, Ms. Wanke's declaration that the CPT codes and the 'place of service' codes used by Doctors Express in its claim forms specified locations outside of emergency departments does not address the nature of the services rendered and does not support a ruling that the services rendered by Doctors Express were not emergency services." YDM neglects to address the fact that Wanke's declaration does not rely solely on the fact that the coding indicates that the services were not rendered in an emergency department, but that the *CPT codes used indicated that no emergency services were provided*. Again, Wanke states, "None of the CPT codes identify the services provided as emergency services." This statement does not refer to the location of the provision of the services; rather, it is a statement about the nature of the services provided. Therefore, notwithstanding YDM's argument to the

---

11    As Sharp points out in briefing, the full documentation for all of the claims that make up the 113 page spreadsheet that includes approximately 50 items on each page would result in over 20,000 pages of documents. Requiring the trial court to review all of that documentation, when a summary setting forth the pertinent information from the underlying documents is sufficient, would be a waste of judicial resources and time. (See *Heaps v. Heaps* (2004) 124 Cal.App.4th 286, 293 ["since the schedule was a general compilation of documents that could not be examined individually by the court without great loss of time, it was admissible"].)

27

contrary, Wanke's declaration does in fact "support a ruling that the services rendered by Doctors Express were not emergency services," given that Doctors Express never claimed, through the CPT codes that it submitted, that it had provided emergency services.

b. *Because Sharp met its burden to make a prima facie showing, it shifted the burden to YDM to demonstrate the existence of a triable issue of material fact; YDM failed to meet this burden*

Based on Wanke's declaration, Sharp made a prima facie showing that YDM cannot establish that it is entitled to reimbursement for the provision of "emergency services." The burden thus shifted to YDM to make a prima facie showing of the existence of a triable issue of material fact. (See *Aguilar*, *supra*, 25 Cal.4th at p. 850.) YDM relied upon Nissanoff's declaration to attempt to establish the existence of a triable issue of material fact. YDM argues that Nissanoff's declaration places in dispute the material facts on which Sharp relies, which are based on evidence from Wanke's declaration.

Nissanoff's declaration, however, does not place in dispute the fact that Doctors Express did not utilize any "emergency services" CPT codes in the billings it submitted to Sharp, and that therefore, Doctors Express essentially conceded that it did not provide "emergency services" to Sharp members. YDM argues that Nissanoff's declaration creates a triable issue of material fact as to whether the services provided by Doctors Express to Sharp members were "emergency services" because Nissanoff states that he reviewed all of the claims assigned by Doctors Express to YDM, and that they all "involved the provision of emergency services." However, the trial court excluded the

28

paragraph of Nissanoff's declaration in which he states this conclusory opinion.

Although YDM challenges the trial court's ruling, we see no error or abuse of discretion in the court's exclusion of this portion of Nissanoff's declaration. Specifically, the Nissanoff declaration lacks foundation with respect to the opinion that he states in paragraph 16 because Nissanoff purports to opine on the nature of the services provided by Doctors Express, without any reference to the actual CPT codes used in Doctors Express's billing, and without attaching the other claim documentation on which he purportedly relied that would establish that the services provided were emergency services.[12]

Finally, even if we were to consider paragraph 16 of Nissanoff's declaration despite the trial court's exclusion of it, it is insufficient to place in dispute the fact that Doctors Express did not *bill* Sharp for emergency services. Nissanoff's declaration concedes that CPT codes are used to communicate to a health care service plan the nature of the medical services provided and does not place in dispute Wanke's declaration

---

[12] Citing *Shugart v. Regents of University of California* (2011) 199 Cal.App.4th 499, 506, YDM argues that "[t]he *Garibay* case does not require a party opposing summary judgment to file duplicate copies of the medical records on which the opposing expert relied in forming a disputed expert opinion if they are already before the court in support of the motion." However, Nissanoff's opinion does not appear to be based solely on the summary of Doctors Express's billing to Sharp that was included in the spreadsheet supporting Wanke's declaration. Rather, Nissanoff states that he "reviewed all of the claims assigned to Plaintiff" in order to reach his opinion that "all of those services which have been assigned to YDM involved the provision of emergency services to patients by the assignees." Since Nissanoff does not appear to rely solely on the CPT codes or place-of-service codes for his opinion, his declaration must be supported by the documents and information that he reviewed in forming that opinion.

29

stating that Doctors Express's billings did not use the CPT codes that specify the provision of emergency services. Specifically, Nissanoff does not state that the CPT codes that Wanke identifies as being the codes used to identify the provision emergency services—i.e., CPT codes 99281, 99282, 99283, 99284, and 99285—are not, in fact, used to identify the provision of emergency services. Nor does Nissanoff state that there are additional CPT codes, other than the ones that Wanke identifies, that identify emergency services. Thus, there is no dispute that Doctors Express did not utilize CPT codes that would indicate to a health care service plan that it had provided emergency services. By not *billing* Sharp with CPT codes utilized to communicate that emergency services were provided, Doctors Express essentially conceded that it was not claiming that it had provided emergency services.[13]

Beyond this, the Nissanoff declaration is devoid of any explanation or reasoning to support Nissanoff's conclusory opinion that the services provided were, actually, "emergency services"—an opinion that conflicts with the CPT codes used in Doctors

---

[13]    At oral argument, counsel for YDM asserted that urgent care centers are prohibited from using the CPT codes identified by Wanke as the codes used to bill for "emergency services." When questioned about this, however, counsel conceded that YDM's expert did not attest to this in his declaration, and did not otherwise indicate that there are no CPT codes that an urgent care center could utilize that would indicate that emergency services had been provided. We must decide the issues before us based on the record presented, including the evidence submitted by the parties in support of and in opposition to Sharp's motion for summary judgment. There is no evidence in this record that urgent care centers are prohibited from utilizing the CPT codes identified by Wanke as the billing codes for "emergency services" or that the codes that Doctors Express used in its billings indicated in any way that the services it provided were "emergency services."

Express's own billing that indicated the provision of nonemergency services, only. A party cannot manufacture a triable issue of fact with a self-serving expert opinion that lacks any basis or explanation for the opinion and that is inconsistent with its own admissible statements. (See *McGonnell v. Kaiser Gypsum Co.* (2002) 98 Cal.App.4th 1098, 1106 ["Plaintiffs cannot manufacture a triable issue of fact through use of an expert opinion with self-serving conclusions devoid of any basis, explanation, or reasoning"]; see also *Golden Eagle Refinery Co. v. Associated Internat. Ins. Co*. (2001) 85 Cal.App.4th 1300, 1315 [" '[A]n expert opinion is worth no more than the reasons upon which it rests.' '[A]n opinion unsupported by reasons or explanations does not establish the absence of a material fact issue for trial, as required for summary judgment' "], disapproved of on other grounds in *State of California v. Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1036.)

Finally, YDM contends that the trial court erred "[t]o the extent" that it considered "new evidence" that Sharp offered in support of its reply papers, and urges this court not to consider this evidence in reviewing the trial court's granting of summary judgment in favor of Sharp. YDM asserts that "a moving party on summary judgment may not offer new supporting evidence for the first time in its reply brief." Sharp submitted a reply declaration by Wanke, as well as the new declaration of Lucinda Ehnes, an attorney who served as the Director of the California Department of Managed Care. We are not convinced that the trial court considered either of these declarations that were submitted with Sharp's reply papers. In its written ruling, the trial court relied on, and cited to, Wanke's original declaration submitted in support of Sharp's moving papers. The court

31

did not rely on any of Sharp's evidence submitted in reply. Further, this court has not considered that evidence in determining whether summary judgment was properly granted. We conclude that summary judgment in favor of Sharp is appropriate based on Wanke's original declaration, which Sharp submitted in support of its motion for summary judgment. The fact that Sharp submitted this additional evidence in reply, even if doing so was improper, does not alter our analysis.

## IV.

## DISPOSITION

The judgment is affirmed.

AARON, J.

WE CONCUR:

HALLER, Acting P. J.

O'ROURKE, J.